STATE of Tennessee, Appellee,

v.

Danny BOLING and, Dwight
Boling, Appellants.

Court of Criminal Appeals of Tennessee,
at Knoxville.
Permission to Appeal
Denied by Supreme Court,
Aug. 31, 1992.

May 6, 1992.

David W. Webb and James W. Greenlee,
Sevierville, for appellants.

Charles W. Burson, Atty. Gen. and Re-
porter, C. Anthony Daughtrey, Asst. Atty.
Gen., Nashville, G. Scott Green, Asst. Dist.
Atty., Sevierville, for State.

OPINION

WADE, Judge.

The defendants appeal from their convic-
tions for kidnapping and aggravated as-

sault. Danny Boling received concurrent sentences of nine years for aggravated kidnapping and six years for aggravated assault. Dwight Boling received concurrent sentences of five years for simple kidnapping and six years for aggravated assault.[1] In addition to a challenge to the sufficiency of the evidence on each conviction, the defendants allege that the trial court committed error by determining that the victim was incompetent to testify. We affirm the judgments.

On February 28, 1990, David Reagan observed a red Camaro, occupied by the defendants and Tony Padilla, pass a white Ford pickup truck going in an opposite direction on Allensville Road. He heard the Camaro's horn blow as it passed. The Camaro's driver spun into Reagan's driveway, turned around, and followed the truck. Reagan then observed the vehicles travel between 200 and 300 yards to a nearby cemetery where one or more of the Camaro's occupants got out and ran over to the truck. After a few moments, Reagan saw the vehicles pull out of sight, heard tires screech, and a crash. A few seconds later, he heard another crash. When Reagan went to the scene, he saw people fighting near the two vehicles.

Jimmy Frye also heard the collisions and drove to the scene to investigate. While there, he saw Danny Boling drag the victim, Corky Sneed, out of the white Ford truck, kick him, and grab him by the hair. Danny Boling picked the victim up, threatened to kill him, and punched him in the ribs with his right hand. Frye never saw the victim strike a blow.

Bobby Joe Parton and Darrell Ogle were occupants of Sneed's vehicle. Parton testified that Sneed stopped his vehicle to talk to the defendants. He observed Dwight Boling walk to the driver's side of the truck and punch the victim through the open window. The victim did not fight back but, at Parton's directive, tried to drive away. Danny Boling followed in his car and twice rammed into the side of the truck.

Parton ran into the woods. He saw Danny Boling punching and cursing the victim, demanding $900.00; Danny Boling grabbed the victim by the hair and tried to force him into the Camaro. Parton said the victim never struck at the defendants but did try to get away. Parton also stated that since the attack, the victim had asked him on several occasions what had occurred. Afterward, the victim would have no recollection of what was said in those earlier conversations.

Carol Mann, a school bus driver, observed Danny Boling in the Camaro and Dwight Boling driving the white pickup truck. She saw Danny Boling go to a third vehicle and try to get "someone" out of the car. Mann heard Danny Boling tell the third car's driver that "we just want the guy out of this car, here." When the victim got out, he rant towards Mann, asked her to take him to jail, and said that the defendants were going to kill him. Mann saw Danny Boling twisting the victim's hand and Dwight Boling shoving him into the car. The victim had blood on his shirt; he appeared to have been roughed up and was obviously frightened.

Another witness, Sue Ivers, saw two vehicles in the intersection at Millican Grove Road. When she saw a man being beaten while held by two other men, Ivers drove to a gas station and telephoned authorities.

Officers found the victim lying on the edge of Robertson's Gap Road. The victim was unconscious and had a wound to the back of his head. An ambulance driver found the victim lying face down with lac-

---

1. Both defendants were indicted for aggravated kidnapping and aggravated assault. As to Danny Boling, the jury returned a verdict of guilty as charged of aggravated kidnapping. As to Dwight Boling, however, the jury returned a verdict of guilty of simple kidnapping, a lesser included offense. Both men were found guilty of aggravated assault. The briefs of both the defendants and the state incorrectly note that both defendants were found guilty of aggravated kidnapping. The judgments reflect the proper convictions and sentences.

erations and abrasions. A detective who inspected the defendants' vehicle determined that the automobile appeared to have been wiped clean. No blood was found on the car or on the cloth seats.

Robbie Reagan saw the victim's truck and the defendants' Camaro on Allensville Road. As Reagan drove by, he saw someone sitting on the passenger's side of the Camaro; the person was not moving and had his head tilted back. Reagan saw Danny Boling "digging" in the back of the victim's truck and another person sitting inside the truck. Reagan also saw a tire tool on the side rail of the victim's vehicle.

The victim was treated at the University of Tennessee Medical Center. Dr. Bernard Kliefoth performed surgery on the blood clot pressing on the back part of the victim's brain. Dr. Kliefoth stated that the victim had black eyes, a laceration to the back of his head, and abrasions to his shoulder. After two weeks of hospitalization, the victim was discharged to a rehabilitation center. The doctor stated that the head injury was consistent with being struck by a hard, blunt object but could have the result of the victim's jumping out of a moving car. The abrasions were consistent with road rash. The victim's injuries were the type which could have resulted in loss of memory. Dr. Kliefoth observed that the victim had problems with both his speech and memory at the time of his last visit, some months before the trial.

Tony Padilla testified for the defense. He stated that the defendants turned to follow the victim and the occupants of his truck. The truck stopped and Dwight Boling got out to talk to the victim. He related that the victim quickly drove away with Dwight hanging on to the side of the truck. Padilla and Danny Boling followed in the Camaro. There were two collisions. After the second, Dwight Boling lost his hold on the truck. Danny Boling, the driver of the Camaro, blocked the truck by turning his car sideways. Danny Boling scuffled with the victim as the other passengers in the truck fled. The victim ran but Danny Bol-

ing caught him saying he intended to take him to jail. As Danny Boling forced the victim into the Camaro, the victim asked a school bus driver (Mann) if she would take him to the jail. Danny Boling drove the Camaro and Dwight Boling followed in the victim's truck. As they turned off Allensville Road onto Robertson's Gap Road, the victim went out of the car. Padilla and the two defendants stopped the vehicle, checked the victim, and then drove away in the Camaro. On cross-examination, Padilla admitted that the most direct route to the jail was for the defendants to have continued on Allensville Road. Padilla stated that he did not hear the defendants discuss whether to take the victim to the jail or notify authorities.

The defense called the victim, Corky Sneed, as a witness. In a jury out hearing, the victim denied having any recollection of the incident. He could only remember getting together with Bobby Joe Parton and Darrell Ogle earlier in the day. He did not recall talking to either of the defendants. The witness did recollect having talked to Parton sometime after the attack in an attempt to find out what had occurred. He tape-recorded the conversation. The trial court ruled that the defendant could not call the victim for the purpose of impeachment only.

After the jury reconvened, Darrell Ogle, the other occupant in the victim's vehicle, testified that the victim and Dwight Boling exchanged words. They began to swing at each other while the victim was still in the truck. After Danny Boling blocked the truck, there was an argument about the payment of damages from the two collisions. At that point, Ogle left.

Dwight Boling testified that he simply wanted to talk to the victim. He got out of his car and walked to the driver's side of the victim's vehicle. When cursed by the victim, Dwight Boling struck him and the victim returned in kind. As the victim tried to drive away, Dwight Boling grabbed the door and held on until the second collision. The victim tried to run away but was

returned to the Camaro. Danny Boling left with the victim and Dwight followed in the victim's truck. After turning on to Robertson's Gap Road, the Camaro door swung open, the victim went out of the car, landed on his back with his hands out, and rolled to the shoulder of the road. Dwight Boling stated that they instructed the victim to get into his truck and then left.

Danny Boling verified his brother's version of the events. He stated that each of the collisions occurred when he tried to pass the victim on the right. Danny Boling admitted fighting with the victim. When the victim fled, he caught him, returned him to the Camaro, and instructed his brother to follow them to the jail in the truck. He said that the victim promised to pay for the damage enroute. After turning onto Robertson's Gap Road and driving between 15 and 20 miles per hour, the victim said, "I'm out of here," and jumped from the car. Afterwards, Danny Boling determined that the victim was not seriously injured, only out of breath. He denied striking the victim in the back of the head and stated that he had no intentions to hurt him because of their past friendship.

 On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which might be drawn therefrom. *State v. Cabbage*, 571 S.W.2d 832, 836 (Tenn.1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the evidence are matters entrusted exclusively to the jury as triers of fact. *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn.Crim.App.1978). A conviction may only be set aside when the reviewing court finds that the "evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn.R.App.P. 13(e).

The evidence produced presented a classic case for the jury. The verdict accredited the testimony of the prosecution witnesses. The evidence, circumstantial and direct, supports their conclusion. We must conclude that a rational trier of fact could have found the essential elements of each crime. The proof presented satisfies the applicable standard. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

I

The defendants specifically argue that there was no evidence they intended to inflict "serious bodily harm," an element of the aggravated kidnapping offense. Tenn. Code Ann. § 39–13–301(a)(3) (Noncumulative Supp.1989). The defendants insist that their intention to detain was not unlawful. Finally, they claim there was insufficient evidence to establish that the assault was aggravated. Tenn.Code Ann. § 39–13–102(a) (Noncumulative Supp.1989). That is, that there was no direct proof that they struck the defendant in the back of the head.

 Circumstantial evidence alone may be sufficient to convict one of a crime. *Marable v. State,* 203 Tenn. 440, 313 S.W.2d 451, 456–57 (1958). Whether other reasonable inferences are excluded by the circumstantial evidence is a question for the jury. *State v. Crawford,* 225 Tenn. 478, 470 S.W.2d 610, 612 (1971); *Williams v. State,* 520 S.W.2d 371 (Tenn.Crim.App. 1974). There was both direct and circumstantial evidence against the defendants in this trial.

 The proof established that the defendants initiated the assault. Danny Boling drove the Camaro in pursuit of the victim's truck. Dwight Boling struck the victim and grabbed onto the truck's door as the victim tried to leave. When the victim tried to flee, both defendants made pursuit. There was evidence that Danny Boling struck, kicked, and threatened to kill the victim. Dwight Boling gave assistance to his brother. Other evidence established that the defendants not only intended to inflict serious bodily injury, but also meant to terrorize the victim. *See* Tenn.Code Ann. § 39–13–301(a)(3). Either would have

been adequate to establish the offense of aggravated kidnapping.

The state also met its burden with respect to the charge of aggravated assault. There is circumstantial evidence that the defendants caused the victim the requisite serious injury. The defendants took the victim against his will. They used physical force to accomplish their goal. The victim was threatened and beaten before being placed in the defendants' Camaro. He was not permitted to escape. A witness saw blood on the victim's clothing; he appeared to have been beaten. The defendants had exclusive control over the victim until he left, in one way or another, the moving vehicle. Their continued assault ultimately led to the victim's "serious bodily injury." Tenn.Code Ann. § 39–11–106(a)(2). We would uphold the conviction of aggravated assault whether the injury was caused "intentionally, knowingly, or recklessly." Tenn.Code Ann. § 39–13–101(a)(1).

## II

The defendants claim that the trial court erred by finding that the victim was incompetent to testify. They assert that they were entitled to compel process, confront the accuser, and impeach the victim with tapes of his pre-trial conversation with Bobby Joe Parton.

The victim was subpoenaed by the defense. Although somewhat late in arrival, the victim appeared just after he was called to the stand. The state acknowledged that the victim's treating neurologist, Dr. Roy Powers, had conceded that the health of the victim was adequate for giving testimony. When defense suggested that the victim might be a hostile witness, the state insisted that the "foundation needs to be laid first." The victim admitted to having taped a telephone conversation with Bobby Joe Parton; defense counsel stated that the interrogation would establish that Parton intended to influence the victim's trial testimony. The victim claimed to have no recol-

lection of the assault or the kidnapping; defense counsel intended to impeach the victim by the use of the tape. The victim was placed under oath without objection. Defense counsel hoped, among other things, to establish that the victim jumped from the moving vehicle. The ultimate intent, apparently, was to establish that the victim, by leaping from the defendants' car, caused his own injuries.

The trial court ruled out the proposed line of questioning on the basis that it was irrelevant. After further questioning out of the presence of the jury regarding the degree of the victim's recollections, the trial court made the following observations:

> [Y]ou can't call [the] witness solely for the purpose of impeaching him.... [U]pon the cross examination here, based upon the doctor's testimony from yesterday, and the answers elicited from this witness here today, the Court finds that this witness is not competent to testify as to the issues, as to the events on February 28th, and therefore, may be not called as a witness for that reason....

It has long been the statutory law of this state that "[e]very person of sufficient capacity to understand the obligation of an oath is competent to be a witness." Tenn. Code Ann. § 24–1–101. On January 1, 1990, our state adopted the Tennessee Rules of Evidence:

> Every person of sufficient capacity to understand the obligation of an oath or affirmation is competent to be a witness except as otherwise provided in these rules or by statute.

Tenn.R.Evid. 601.

In this regard, the victim was clearly competent to testify. He was routinely administered the oath. No objections were made. Incompetency may be established by a witness' mental or physical incapacity to understand the oath. Other rules of evidence such as lack of personal knowl-

edge, or statutory competency, such as the Dead Man Statute,[2] may apply but could not be used here. N. Cohen, D. Paine & S. Sheppeard, Tennessee Law of Evidence, § 601.2 (2nd ed. 1990).

■ The state argues that the trial court properly excluded the witness based upon the "lack of personal knowledge rule":

> A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony....

Tenn.R.Evid. 602.

Also called the "first-hand knowledge rule," this provides that a witness is not competent to testify unless he perceived the facts through one or more of the five senses. Exceptions, of course, are expert testimony and admissions of a party opponent. As to the latter, admissions of a party opponent may be introduced into evidence even though the declarant lacks or claims to lack knowledge of the event. *State v. Mathis*, 702 S.W.2d 179, 182 (Tenn. Crim.App.1985); *Miller v. Denman*, 16 Tenn. 233 (1835).

The basis of the exception has been explained as follows:

> [A] rigorous application of the personal knowledge rule could render it difficult to satisfy the foundation for the personal knowledge rule since the party opponent could easily deny that the earlier statement was based on personal knowledge and thereby render the now harmful statement inadmissible. *Since the personal knowledge rule does not apply to admissions*, there is no need to consider whether the foundation for the rule is satisfied for such statements.

N. Cohen, D. Paine & S. Sheppeard, Tennessee Law of Evidence, § 602.2 (2nd ed. 1990) (emphasis added).

Here, the victim claimed no memory of the events of the kidnapping or the assault. The witness admitted that he taped a conversation with Parton to "find out, sort of what happened." The tape may have contained admissions by the victim; if so, they would have been admissible. The defense also intended to use the tape "to impeach this man ..." as to, we think, his lack of recollection. It could have done so. We hold that the victim meets the personal knowledge test. All the proof suggests that he knew, or should have known, but for his head injury, the circumstances. Whether his recollections were in fact affected, especially in view of medical evidence that the victim was able to testify, was a proper subject of inquiry.

Rule 607 of the Tennessee Rules of Evidence provides that a witness' credibility may be attacked by the party calling the witness. This new rule abolished the "voucher rule"—the rule prohibiting the impeachment of a party's own witness. The trial court erroneously cited the old rule. The defendants insist that had the victim been required to testify, the results of the trial would have been different. The victim was competent to testify. His treating physician, with some reservation about whether his giving testimony was preferable, verified the victim's physical and mental ability to do. The victim was placed under oath. His testimony as the victim of an assault and kidnapping would ordinarily have been critical. The defense was entitled to impeach the victim's lack of recollections by the taped conversations.

On the other hand, the defendants, despite arguments that their constitutional rights to confrontation and compulsory process had been abridged, cite no authority. In that respect, any constitutional objections to the testimony have been waived. Tenn.R.App.P. 27(a)(7); Tenn.Ct.Crim.App. Rule 10(b). Moreover, no constitutional violations are apparent. The defendants' arguments are based entirely upon the trial court's failure to properly apply the new

---

**2.** Tenn.Code Ann. § 24–1–203.

rules of evidence. There was error. The question becomes whether the error "more probably than not" affected the verdict. Tenn.R.App.P. 36(b).

We must first address the issue of the tape. It is not in the record. Yet defense counsel produced a partial transcript of the tape. The transcript of the hearing on the motion for new trial contained the following exchange:

> GENERAL GREEN: As an Exhibit to that motion there is a typed up transcript ... I'm assuming Mr. Webb's office prepared that transcript, I would just like to offer my exception to the inclusion of that transcript because the Court Reporter took, recorded the tape, itself, it's already a part of the record, and if I'm not mistaken the tape was filed at that time as well. And I think that would speak—
>
> MR. WEBB: I don't think the tape was filed, and that bothered me. I don't know how to get something up to the Court of [Criminal] Appeals, that's why I typed up the transcript.
>
> GENERAL GREEN: Well, but, as you, if you recall, we were in Chambers, and Elaine took down that we played the tape and she took that down—
>
> MR. WEBB: Right. Well, what I ... what I typed out as an Exhibit is the same thing that she ... transcribed—
>
> THE COURT: So would there be any objection of him late filing the tape?
>
> MR. WEBB: I don't know if the tape needs to be filed, or not. That was an evidentiary [objection] that I have.
>
> THE COURT: Okay, now, I will leave that up to you all.
>
> MR. WEBB: I, I would like to go ahead and re-record that tape, and file it. Don't you ...
>
> GENERAL GREEN: As far as the, you know, now, I'm not making any concession that it's properly ... [a] part of this record, but I have no objection for purposes of appeal ... [s]o that they have,

because I think they need to listen to the tape to understand the tenor, because it's certainly our position that Corky Sneed's *in an asking posture, and without that suggestion, question, I think the tape, listening to it, you hear that.* So for the purposes of just, as a proper proof, no, I don't have a problem with filing the tape.

> \* \* \* \* \* \*
>
> MR. WEBB: Very frankly, Your Honor, the taped conversation went to the heart of our defense. In fact, when the Court overruled that I had to go to closing argument, and I struck out about half of it. Because we felt like the taped statement that Corky Sneed made, it was admittedly made after the, the act, and before this trial. And I felt, your Honor, that the statement showed two things. It showed that Mr. Sneed had a memory of the events, he tried to coax Bobby Joe Parton into agreeing with him as to his recollection. And as the Court remembers, I feel the Court does remember the tape.

(Emphasis added.)

In *Dearborne v. State,* 575 S.W.2d 259 (Tenn.1978), the Supreme Court observed, in an opinion on petition to rehear, that, on appeal, cases are decided "on the basis of the record as presented to us for our consideration, and not as they might, or should, have been presented." *Id.* at 264. The transcript of the tape is incomplete. The inflections of voice to indicate whether the victim asked questions as he re-stated the events is altogether absent. The assistant district attorney asserted that the victim's statements were clearly in an "asking posture." We must speculate as to the meaning of the taped exchange. The trial court characterized the content as follows:

> [T]here was no issue, or nothing in that tape that was offered, would be helpful to the Jury in inferring intent, or any other factor as to what occurred out there on Robertson's Gap Road. It is circumstantial as to part of it.

It is the duty of the appellant to prepare a record which conveys a fair, accurate and complete account of what transpired in the trial court with respect to the issues which form the basis of the appeal. Tenn.R.App.P. 24(b); *State v. Miller*, 737 S.W.2d 556, 558 (Tenn.Crim.App.1987); *State v. Rhoden*, 739 S.W.2d 6 (Tenn.Crim. App.1987). Absent an essential part of the record, this court must presume that the trial court's determination is correct. *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim.App.1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn.Crim.App.1983).

Other witnesses established each and every element of both offenses beyond a reasonable doubt. At the jury-out hearing, it was established that the victim could not (or would not) recollect any part of his encounter with the Bolings. His testimony would not have benefited the state which had the ultimate burden of proof. By the same token, the record available, including the partial transcript of the tape, does not establish that his testimony would have necessarily served the defendants in a useful fashion. No admissions by the victim were shown. He very well could have been repeating what he had been told by the other witnesses. The tape transcript neither confirms nor denies the victim's statement that he could not remember the course of events. Finally, some of the questions the defense intended to ask the victim were entirely irrelevant. The answers to those questions could not have been permitted under any circumstance. Tenn.R.Evid. 401.

The defendants have not met their burden of establishing that the error was prejudicial or adversely affected substantial rights. In summary, we find no reasonable likelihood that the impact of the error affected the verdict. The judgments are affirmed.

SUMMERS and TIPTON, JJ., concur.