IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 20, 2002 Session

## ANDREW ROBERT DOWNS
v.
## CRYSTAL BAILEY and JONI DOWNS

**An Appeal from the Juvenile Court for Tipton County**
**Nos. J6285-7-294, J7720-8-473      William A. Peeler, Judge**

---

**No. W2002-01362-COA-R3-JV - Filed February 10, 2003**

---

This is a child custody case. The two children involved were born to the mother and father during their marriage. In 1998, the mother and father were unable to care properly for the children, so the mother's sister (the children's aunt) obtained temporary custody. The mother and father divorced in 1999. In 2000, the father filed a petition for custody, claiming that he and his common-law wife could provide a stable home for the children. The aunt sought to retain custody. The mother intervened, arguing that, if permanent custody were not granted to the aunt, then custody should be awarded to her. After a hearing, the trial court granted custody to the father. The mother and the aunt appeal, both claiming that they are entitled to custody. We affirm, finding that the father's rights are superior to those of the aunt, and that the trial court did not err awarding custody to the father rather than the mother.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Affirmed**

HOLLY KIRBY LILLARD, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

J. Thomas Caldwell, Ripley, Tennessee, for the appellants, Crystal Bailey and Joni Downs.

G. Christopher Kelly, Atlanta, Georgia, for the appellee, Andrew Robert Downs.

## OPINION

Petitioner/Appellee Andrew Robert Downs ("Father") and Intervening Petitioner/Appellant Joni Downs ("Mother") were married on April 8, 1995, and were divorced on October 26, 1999. During their marriage, they had two sons who are the subject of this petition for custody, Andrew John Downs ("A.J."), born August 16, 1995, and Zachary Robert Downs ("Zachary"), born January 8, 1997.

Mother and Father had a tumultuous relationship. A few months after A.J. was born, on January 29, 1996, Diane Bailey ("Grandmother"), A.J.'s maternal grandmother, filed a petition for temporary custody of A.J., asserting that Mother was unable to provide a stable environment for him. Grandmother's petition for temporary custody of A.J. was granted. Subsequently, Zachary was born. Grandmother then filed a petition for temporary custody of Zachary. Pending a final decision on Grandmother's petition for custody of Zachary, the trial court ordered that a home study be conducted at the home of Mother and Father by the Tipton County Department of Children's Services. That home study, however, was never performed, and Grandmother did not follow up on her petition for custody of Zachary. Therefore, Zachary remained in the custody of Mother and Father, while Grandmother retained custody of A.J.

On August 28, 1998, Respondent/Appellant Crystal Bailey ("Aunt"), Mother's sister, filed a petition for temporary custody of both A.J. and Zachary. Aunt's petition was signed by both Mother and Grandmother. The petition stated that Grandmother sought to have custody of A.J. given to Aunt, because Grandmother was moving to Florida and believed it was best not to take A.J. away from his home. The petition also stated that custody of Zachary should be changed from Mother and Father to Aunt because "[F]ather is in jail in Kentucky and [M]other is going to Job Corp."[1] The trial court granted Aunt's petition for temporary custody of both A.J. and Zachary. From that time until the order that is the subject of this appeal was entered, the boys lived with Aunt and her father in a two-bedroom mobile home in Covington, Tennessee.[2] During this entire time, neither Mother nor Father made any regular child support payments to Aunt.[3]

After he was discharged from the Army in August 1998, Father moved to Thomasville, Alabama. Mother joined Father in Alabama for a short time, but then the two separated and Mother moved back to Tennessee. Mother lived in Tennessee for the first few years after her separation from Father. While she lived in Tennessee in 1999, Mother and Father divorced. In 2001, Mother moved to Jacksonville, Florida, to live with Grandmother.

While in Alabama, Father met Kimberly Deas ("Deas"). Father and Deas had a son, Andrew Robert Downs, Jr. ("Drew"), born on October 28, 1999, just two days after Mother's and Father's

---

[1] At the hearing on Father's subsequent petition for custody, he claimed that he did not know at the time that Aunt had petitioned for custody of the boys. He testified that, at the time Aunt filed her petition, he was not in jail, but rather he was in Kentucky processing out of the Army, with a less than honorable discharge. In his testimony, Father stated that, while he was in the Army, he had Mother call the Red Cross and tell them that he was needed home because of an emergency. After he went home on a two-week leave, he never reported back to the Army and was considered AWOL. For that reason, the Army gave Father a less than honorable discharge, and held him in Kentucky for approximately two weeks to process out. During that two-week period, Mother agreed to allow Aunt to have temporary custody of the children, alleging that Father was "in jail."

[2] At all pertinent times, Aunt lived with the children in the Covington mobile home, except during the period between February and October 1999, in which Aunt lived alone with the children in a rented two-bedroom mobile home.

[3] Both Mother and Father testified that they occasionally bought the children things such as clothes, shoes, or school supplies. It is undisputed, however, that neither made regular support payments to Aunt.

divorce became final. Deas is now Father's common-law wife under the laws of Alabama. Father, Deas, and Drew still live in Alabama.

On July 25, 2000, Father filed a petition seeking permanent custody of A.J. and Zachary. At the time the petition was filed, A.J. and Zachary were staying with Father and Deas, with Aunt's permission. In the petition, Father asserted that circumstances had changed since the filing of the court's order granting Aunt temporary custody, because Father "now has a stable home environment and wishes to have primary physical and legal custody of his minor children." He further alleged that he was "remarried and that his new wife is a fit and proper person to assist him in raising the minor children, that he has a long held job with steady income and that he has a home which is large enough for his children." Father also claimed that Aunt "and her boyfriend have no home of their own and are currently living with another couple," and that Aunt's "boyfriend is physically and verbally abusive to the minor children." He alleged that Aunt's boyfriend drank alcohol, gave alcohol to the children, and had physically attacked Aunt in front of the children. Therefore, Father asserted, to prevent irreparable harm to the boys, it would be in their best interest to change custody to him. Based on the charges in the petition, the trial court granted Father temporary custody of the children pending a hearing.

On August 17, 2000, Mother filed an intervening petition for custody. Mother alleged that the children had been in Aunt's custody and, therefore, in the family environment of Mother all along. She requested that she get custody "if the Court should find their custody should be awarded to one of the biological parents." Mother maintained that Father should not be awarded custody because he had "been committed to a mental institution and suffered from emotional and psychological illness," and that the children may be exposed to danger if custody were granted to Father.

On September 6, 2000, the trial court held a hearing on its temporary award of custody to Father. At the hearing, the trial court determined that the evidence was insufficient for custody to remain with Father pending the final hearing. Consequently, the trial court ordered that the children be returned to Aunt pending a final ruling on Father's petition. The trial court further ordered that home studies be conducted in the homes of Aunt, Mother, and Father, and said that the case would be set for a hearing when the home studies and any other discovery was completed.

On July 24, 2001, the Tipton County Department of Children's Services filed a home study report on the home of Aunt. The report reflected that Aunt and the two boys lived with Aunt's father in a two-bedroom mobile home in Covington, Tennessee. One of the boys shared a bedroom with Aunt, while the other shared a room with Aunt's father. Although Aunt was unemployed, the mobile home was reported as paid in full, and the family's income consisted of Aunt's father's social security disability check and monies from state assistance programs. The home study report stated that Aunt was taking classes by mail to enter into the medical billing field. The report also noted that Aunt did not have a criminal record, and observed that she had generally been a loving, caring, custodian for the boys. The case manager concluded that Aunt would provide an "adequate and stable placement" for them.

On October 18, 2001, Father's home report study was filed by a private, independent certified social worker hired by Father to conduct the study. The report stated that Father and his wife, Deas, lived with Drew in a three-bedroom mobile home near Thomasville, Alabama. The couple had their own bedroom, Drew had his own bedroom, and the third bedroom had bunkbeds and was available for A.J. and Zachary. The report stated that Father was employed as a truck driver, earning $8.00 per hour working fifty hours per week, and Deas was employed as a shift manager at McDonald's, earning $6.85 per hour working forty-five hours per week. Deas primarily worked the night shift, and said that she could depend on her nearby mother and aunt to help out with child care if needed. The report noted that adequate health insurance would be available to the boys through either Father's or Deas's employment. The home study report stated that neither Father nor Deas had a criminal record. In March 1999, Father was charged with assault of his brother, but that charge was dismissed. The social worker concluded from the study that there were "no barriers . . . which would adversely affect the placement of AJ and Zack in the home of Mr. Downs and Ms. Deas. All indicators reveal that this would be a suitable home for these children."

The trial was held on March 7, 2002. At trial, the court heard testimony from Father, Deas, Aunt, and Mother, who testified to many of the facts noted above. In his testimony, Father said that, throughout their marriage, he and Mother often separated and reconciled. He admitted to physically abusing Mother and to having an affair during their marriage. The extramarital affair produced a daughter, who now lives in New Jersey.[4] Father said that he and his common-law wife, Deas, had been together for almost four years. He testified that A.J. and Zachary had stayed with him and Deas for two weeks over the summer of 2001, but that he had seen them only a few times since then. Father recounted an occasion on which he went to Aunt's house to see A.J. and Zachary, but Mother was there and would not let him see the boys. Father admitted to having been institutionalized because of a psychological breakdown for two weeks during 1998. He claimed, however, that he worked to become stable in order to seek custody of A.J. and Zachary. He maintained, "I was not stable then, but the fact is, I am stable now." If he were granted custody of the boys, Father said he would put them in school in Alabama and sign them up to play tee-ball.

Deas testified that her relationship with Father was not violent or abusive, and that Father is a very patient father to their son Drew. She described the room she and Father had prepared for A.J. and Zachary in their three-bedroom home, with bunkbeds, a dresser, a television, and video games. She admitted that she started dating Father when he was still married to Mother, but explained that, at that time, she thought his marriage to Mother had become unworkable.

Aunt testified as well. She said that she had had custody of the boys since August 1998.[5] She said that she and the boys lived with her father in his two-bedroom home in Covington. She said that her bedroom is basically the boys' bedroom, but that she keeps her clothes in there. She

_____

[4] Father admitted that he has never seen his daughter, but said that he pays $200 per month in child support for her.

[5] After Father filed his petition, he had temporary custody of the boys in July, August, and September of 2000. At that point, the trial court ordered that custody be returned to Aunt until the final hearing.

acknowledged that she had been unemployed since June of 2000, and explained that her unemployment was due in part to difficulty in finding child care. Aunt said that her father was disabled and that he had a drinking problem, but that her father's problems did not adversely affect the children. She stated that the boys are with her at most times, and that her father and her sister kept them only for short time periods when necessary.[6] Though Mother had not sent Aunt regular child support payments, Aunt testified that Mother and Grandmother sent her necessities for the boys, such as school shoes, school clothes, and similar items. Aunt testified that she loves the children and wants a good future for them. She said that she was willing to move to Florida to live with Mother and Grandmother if the court found that such an arrangement would be in the children's best interest.

Mother also testified. When asked about her marriage to Father, Mother asserted that, while she and Father were married, he beat her, strangled her, and hit her in the mouth. She described an incident in which Father punched her in her stomach just after she had given birth by cesarean section, and then when police officers came to the door and banged on it, Father put a gun to Mother's head and threatened her not to answer the door. Mother acknowledged that she had lived in approximately five residences in the four years prior to the hearing, and said that in the year preceding the hearing, she had been living with Grandmother in Jacksonville, Florida. She testified that she lost her job in May 2001, and that she obtained a job with the Discovery Channel in approximately October of that year. However, in November 2001, she injured her foot, which caused her to leave her job and prevented her from working further. Mother said that, during times in which she was unemployed, Grandmother supported her. She said that she visited A.J. and Zachary every two or three months. Mother claimed that she did not have a home study completed on her home because "they wouldn't allow it in Tennessee and [she] couldn't afford it at the time to have my own done." She testified, however, that she and her mother live in a three-bedroom house, and that A.J. and Zachary stayed with them in Florida from June 27 through August 7, 2001. Mother said that she wanted custody of the boys, but that if she were not awarded custody, she would endorse Aunt as the custodial parent. Mother explained, "I would rather see my kids with me where they belong, but if that can't be, then she's the best . . . she's the best person for them."

At the conclusion of the trial, the trial court issued a decision from the bench granting Father's petition for custody of A.J. and Zachary. The trial court reasoned:

[R]eally it's a battle between [Aunt] and [F]ather. But, [Aunt] has been the primary custodian. She's had temporary custody. [Mother] has been out of state. She said she's visited with her children . . . once every two or three months. That she . . . hadn't really provided any support. She's living with her mother in Florida and she's really . . . hasn't been . . . custodian, . . . and the court doesn't see it's a real legitimate . . . effort on her part to regain the custody. It seems to really be a battle between [Aunt] and [Father]. . . . [A]ll things being equal, you've got a parent battling a non-

[6]Aunt admitted that her sister, Stormy, who occasionally keeps the children, has been convicted of burglary and uses foul language.

-5-

parent, whether it be a grandparent, aunt and uncle, cousin, a . . a non-relative, the father has . . the father or mother has the law on their side. If the fath[er] or parent, or father could show that he was a fit, proper person to . . . regain custody of his children, that the court should order. . . . Now, we've . . I've had a lot of testimony about [Father's] past, but [the] home study out of Alabama indicates that he doesn't have any criminal record and he's had relatively stable employment, he has a fit . . he has a good stable situation for the children. So, the court rule[s] in favor of [Father].

On April 11, 2002, the trial court entered an order in accordance with its oral ruling, granting Father's petition for custody. Both Aunt and Mother now appeal that order.

On appeal, Aunt argues that the trial court erred in granting Father custody because, historically, he has been an immoral, unstable, violent, and dangerous person and, therefore, he cannot properly care for the children. Furthermore, she claims that, based Father's history, the trial court should have determined that Father effectively waived his parental rights. Aunt argues that she has proven that she loves the children and that she has properly cared for them while they were in her custody.

Mother argues on appeal that the trial court did not adequately consider her petition for custody, because it determined that her claim that she wanted custody of the boys was insincere. In reasoning that "really it's a battle between [A]unt and [F]ather," she argues, the trial court failed to conduct a best interest analysis, which is necessary in a custody dispute between parents. Mother argues that, under the circumstances, in which Mother is prepared to raise the children in Florida with the assistance of both Aunt and Grandmother, the court should have found that it was in the boys' best interest to award custody to Mother.

Father argues on appeal that he has adequately shown that he is a fit parent. He claims that the trial court was correct in finding that his parental rights were superior to those of Aunt, and that the trial court correctly found that it was in the boys' best interest to award custody to him.

We first examine the standard applied to the custody dispute between Father and Aunt, contrasted with the standard applied to the custody dispute between Father and Mother. At the outset, we note that the challenged custody order awarding custody to Aunt is a temporary, not a permanent, order of custody. Since the order awarding custody to Aunt is a temporary one, Father still "enjoys the presumption of superior rights" over Aunt, because he is a parent and she is a non-parent. *Blair v. Badenhope*, 77 S.W.3d 137, 143 (Tenn. 2002) (holding that the doctrine of superior rights does not assist a parent who attempts to obtain custody when a valid permanent order properly transferred custody to the non-parent). Under these circumstances, Father will not be deprived of custody of his children in favor of Aunt unless Aunt can show that Father is unfit or that the children are in danger of substantial harm if custody is awarded to Father. *See id.*; *see also Marsh v. Sensabaugh*, No. W2001-00016-COA-R3-JV, 2001 WL 1176017, at *13 (Tenn. Ct. App. Oct. 1, 2001). This stands in contrast to the standard for the custody dispute between Mother and Father.

As between Mother and Father, neither party has superior rights over the other, so custody of the children should be placed according to the children's best interest. *Holeman v. Holeman*, M2001-00622-COA-R3-CV, 2002 WL 31397344, at *3 (Tenn. Ct. App. Oct. 24, 2002); *see* Tenn. Code Ann. § 36-6-106(a) (2001); *Parker v. Parker*, 986 S.W.2d 557, 562 (Tenn. 1999) (stating that a child's best interest is paramount, and that the child's best interest is promoted by placing him or her in an environment that will best suit his physical and emotional needs).

The trial court has "the widest discretion" in determining the children's best interest. Tenn. Code Ann. § 36-6-106(a)(2) (2001). A trial court abuses its discretion when it applies an incorrect legal standard, or when its decision "is against logic or reasoning that cause[s] an injustice to the party complaining." *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). On appeal, the trial court's findings of fact are reviewed de novo on the record, accompanied by a presumption of correctness unless a preponderance of the evidence indicates otherwise. *Zabaski v. Zabaski*, No. M2001-02013-COA-R3-CV, 2002 WL 31769116, at *4 (Tenn. Ct. App. Dec. 11, 2002); *see Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d).

Father argues first that this Court should not consider the merits of this appeal because Aunt and Mother failed to satisfy the requirements of Tennessee Rule of Appellate Procedure 24(b). That Rule provides in pertinent part:

> If a stenographic report or other contemporaneously recorded, substantially verbatim recital of the evidence or proceedings is available, the appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal.

Tenn. R. App. P. 24(b). Under Rule 24, the appellant has the duty to file a transcript of the proceedings "which conveys a fair, accurate and complete account of what transpired in the trial court." *Nickas v. Capadalis*, 954 S.W.2d 735, 742 (Tenn. Ct. App. 1997) (quoting *State v. Boling*, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992)). The Rule also requires that the transcript be certified by the appellant, appellant's counsel, or the court reporter as being an accurate account of the proceedings. The appellant must serve notice of the filing on the appellee, and proof of such service must be filed in the trial court. If the appellee has objections to the transcript as filed, he must file objections with the trial court within fifteen days after service. *See* Tenn. R. App. P. 24(b).

At the trial conducted in the court below, no court reporter was present. However, a tape recording of the proceedings was made and transcribed by counsel for Aunt and Mother. Aunt and Mother filed the proposed transcript in the trial court on April 19, 2002, the day they filed their notice of appeal with this Court. There is nothing in the record to indicate that the proposed

transcript was certified, or that it was served on Father at the time it was filed.[7] Counsel for Father asserts that he received a copy of the transcript when he received the parties' appellate brief and other parts of the record. He argues that, because the requirements of certification and notice in Rule 24(b) were not followed, we should refuse to consider the merits of this appeal.

It must be noted that counsel for Father did not object to the transcript in the trial court after he received service thereof, which is also required by Rule 24(b). *Id.* In addition, Father quotes extensively from the transcript in his appellate brief. Moreover, the trial court took no action with respect to the transcript. Under Rule 24(f) of the Tennessee Rules of Appellate Procedure, if the trial court fails to approve the proffered transcript or statement of the evidence within the required time, it is deemed approved and is considered as such by the appellate court. Tenn. R. App. P. 24(f). Under the circumstances, then, we will consider the transcript of the proceedings below as part of the record on appeal. *See Johnson v. Hardin*, 926 S.W.2d 236, 238-39 (Tenn. 1996) (noting that the Rules of Appellate Procedure are flexible and may be suspended in a particular case for good cause). Therefore, we will consider the substantive arguments of Aunt and Mother on appeal.

Aunt argues first that the trial court erred in denying Aunt's claim to custody of A.J. and Zachary. As we have noted, for Aunt to prevail over Father, she must show that Father is unfit or that giving custody to Father will put the children in danger of substantial harm. *See Blair*, 77 S.W.3d at 143. Aunt argues that Father's history of philandering, wife-beating, and failure to financially support the children shows that he is not able to take care of the children. In essence, she claims, Father effectively waived his fundamental parental rights, and therefore he is not entitled to the presumption of superior rights. While Father acknowledged much of the behavior attributed to him, he testified that he had reformed, had a stable job and family environment and no longer engaged in such behavior. The trial court's finding was premised in part on its determination of Father's credibility, which is accorded great deference on appeal. *Nelson v. Nelson*, 66 S.W.3d 896, 901 (Tenn. Ct. App. 2001); *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Moreover, there is sufficient evidence in the record to support the trial court's finding that Father can provide a stable, favorable environment for these children, and that the children are not in danger of substantial harm if custody is awarded to Father. In this respect, the trial court stated:

> I will say on the record that I was impressed with Mr. Downs' demeanor and testimony today, and . . . once again, the court believes that . . . obviously he . . he's had a very checkered past and so has the mother. I know them both, I saw them in court long ago . . . [B]ut what I saw today . . . again I was impressed with his demeanor. [Father] was persisted . . persisted over two years of battling to get his day in court, he . . it shows that he is sincere, in the courts [sic] opinion, in his efforts to try to get the children. He's got a favorable home study and, uh, and no criminal history. [S]tability, a job, he's got his [commercial driver's license]. It just seems[s]

---

[7]Mother and Aunt have attached a letter to their reply brief indicating that their counsel mailed a copy of the transcript to Father's counsel on April 19, 2002, the date it was filed with the trial court. That letter, however, is not "[p]roof of service" that is required to be filed in the trial court under Tenn. R. App. P. 24(b).

that . . it seems like . . . if the time is not right for the . . . him to be allowed an opportunity, it will never be right.

Thus, having been impressed with Father's demeanor and his assertions that he is now willing and able to care for A.J. and Zachary, the trial court concluded that Father was fit and that the children would be safe in his care. Under these circumstances, Father is entitled to the presumption that his rights are superior to Aunt's, a non-parent, and the trial court did not abuse its discretion in granting Father custody over Aunt. *See In re: Askew (Lewis v. Donoho)*, 993 S.W.2d 1, 5 (Tenn. 1999) (holding that, where there has been no finding of substantial harm, the natural parent is entitled to custody over a non-parent, even when child had been living with the non-parent for several years).

On appeal, Mother notes that Father's rights are not superior to hers. She asserts that the trial court failed to seriously consider her claim for custody as against Father's, and did not conduct an adequate best interest analysis. Because the trial court applied the incorrect legal standard with respect to her claim, Mother argues, this Court must reverse the decision of the trial court granting custody to Father over Mother. In the alternative, Mother argues that, even if the trial court conducted a sufficient best interest analysis, such an analysis would have dictated that custody of the children should have been granted to her. She notes that, if she were granted primary custody of the boys, Aunt has agreed to move with the boys to Florida to live with Grandmother. This arrangement, she argues, serves the children's best interests, because they can be raised around the family unit with which they are most familiar – Mother, Aunt, and Grandmother. Like Aunt, Mother asserts that a grant of custody to her is preferable to an award of custody to Father, because Father is not capable of being a moral, stable person in light of his past conduct of wife-beating, philandering, and neglect.

From our review of the record, we must conclude that the trial court gave sufficient consideration to Mother's petition for custody. All of the interested parties testified before the trial court and explained their desire and ability to care for A.J. and Zachary. The trial court noted that, for several years, Mother had not sought custody, but only petitioned for custody of the children after Father filed his petition. It is undisputed that, after Mother moved to Florida, she visited the children only once every two or three months. Moreover, Mother did not file a home study on her residence prior to trial,[8] and in addition, offered only token financial support for the boys. Noting all these factors, the trial court concluded that this case "seems to really be a battle between [A]unt and [F]ather," and proceeded to consider the dispute between Aunt and Father.

In addressing Mother's credibility, the trial judge observed that her attempt to obtain custody of A.J. and Zachary had been less than diligent. Prior to the instant petition, Mother had not sought custody, nor had she made a serious effort to be financially independent from her own mother so as to be able to provide for her children. The trial court apparently concluded that Mother sought custody of the boys so that Aunt and Grandmother could raise and support them. Based on the

---

[8]Mother filed a home study on April 19, 2002, on the same day she filed her notice of appeal. We do not consider the results of that study in resolving the issues on appeal.

record, and giving appropriate deference to the trial court's determinations of credibility, we find no error in this conclusion.

Moreover, in light of the deference given to the trial court's assessment of the parties' credibility, the record supports the trial court's conclusion that the boys' best interests are served by an award of custody to Father, rather than Mother. Father submitted evidence that he had procured permanent employment, that he had the means to obtain health insurance for the family, that he had prepared a room in his home for the boys, and that he intended to care for and raise the children in a stable family environment. Mother, on the other hand, was unemployed and had not previously sought custody from Aunt. Mother did not procure a timely home study for the trial court's consideration. The main advantage that Mother offered was that, through her, the children would be allowed to have a continued relationship with Aunt. While this is a valid consideration, for Mother to be awarded custody, she must show that she, independently, is willing and able to care for the boys in a manner that would serve their best interests. Under these circumstances, we must conclude that Mother has not demonstrated that the trial court erred in giving custody to Father.

The decision of the trial court is affirmed. Costs are to be taxed to the appellants, Crystal Bailey and Joni Downs, and their sureties, for which execution may issue, if necessary.

_____
HOLLY KIRBY LILLARD, JUDGE