262 P.3d 238

STATE of Arizona ex rel. William G. MONTGOMERY, Maricopa County Attorney, Petitioner,

v.

The Honorable Christopher WHITTEN, Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent Judge,

Ricky Brett Keahy Martinez and District Medical Group, Real Parties in Interest.

No. 1 CA–SA 11–0127.

Court of Appeals of Arizona, Division 1, Department A.

July 21, 2011.

William G. Montgomery, Maricopa County Attorney By Adam Susser, Deputy County Attorney, Phoenix, Attorneys for Petitioner.

David G. Derickson, Phoenix, Attorney for Real Party in Interest Martinez.

Snell & Wilmer L.L.P. By Paul Giancola, Brett W. Johnson, Sara J. Agne, Phoenix, Attorneys for Real Party in Interest District Medical Group.

Arizona Prosecuting Attorney's Advisory Council By Elizabeth B. Ortiz, Faith Cheree Klepper, Phoenix, Attorneys for Amicus Curiae.

## OPINION

DOWNIE, Judge.

¶ 1 Several physicians treated an infant who was admitted to the hospital with mortal injuries. When the State sought to call the physicians as witnesses at the criminal trial of the man accused of murdering the child, the doctors objected that they would be testifying as expert witnesses and demanded to be paid as experts. The superior court ordered the State to compensate several of the physicians as expert witnesses. For the following reasons, we accept jurisdiction of the State's special action petition and grant relief.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Seven-week-old Lilliana was admitted to Maricopa Medical Center ("MMC") after a reported fall from a bed. Testing revealed that Lilliana had suffered a massive brain injury and several skull fractures. She died four days later. Real party in interest Ricky Martinez was charged with first degree murder and child abuse.

¶ 3 More than two dozen physicians and healthcare professionals treated Lilliana at MMC. The superior court ordered eleven MMC doctors to submit to pretrial interviews, which occurred at the offices of real party in interest District Medical Group ("DMG").[1] After the interviews, the State disclosed that it would call eight of the physicians as trial witnesses.

¶ 4 DMG filed a Motion for Protective Order and Motion for Accommodation. DMG argued, *inter alia*, that the testimony sought from its physicians was "within the realm of their professional expertise" and "beyond that of a fact witness." DMG asked the court to order the parties to "compensate its physicians in the amount of **$350 per hour** for their preparation for, travel to, and attendance at trial." (Emphasis in original.)

¶ 5 After a hearing, the superior court ordered that six of the MMC doctors be compensated as experts if they are called as trial witnesses. The court denied the State's motion for reconsideration, whereupon the

State sought special action relief in this Court.

## Special Action Jurisdiction

¶ 6 A special action petition seeks extraordinary relief that is usually granted only when justice cannot be obtained by other means. *Nataros v. Superior Court*, 113 Ariz. 498, 499, 557 P.2d 1055, 1056 (1976). A primary consideration is whether the petitioner has an equally plain, speedy, and adequate remedy by appeal. *See* Ariz. R.P. Spec. Act. 1(a); *State ex rel. Romley v. Superior Court*, 172 Ariz. 109, 111, 834 P.2d 832, 834 (App.1992). We also consider whether the special action petition presents an issue of statewide importance affecting numerous cases. *Lind v. Superior Court*, 191 Ariz. 233, 236, ¶ 10, 954 P.2d 1058, 1061 (App. 1998).

¶ 7 The State cannot appeal from the superior court's interlocutory order. Its petition presents a legal question of first impression and statewide importance that has apparently arisen in a number of criminal cases. In the exercise of our discretion, we accept special action jurisdiction.

## DISCUSSION

¶ 8 DMG acknowledges that treating physicians may be called as fact witnesses in criminal cases and that no compensation is due for such testimony. Indeed, treating physicians frequently serve as fact witnesses. *See, e.g., Davoll v. Webb*, 194 F.3d 1116, 1138 (10th Cir.1999) (a treating physician "is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party"); *Fisher v. Ford Motor Co.*, 178 F.R.D. 195, 197 (N.D.Ohio 1998) ("Courts consistently have found that treating physicians are not expert witnesses merely by virtue of their expertise in their respective fields."); *Beaty v. St. Luke's Hosp. of Kansas City*, 298 S.W.3d 554, 559 (Mo.Ct.App.2009) (a treating physician "is first and foremost a fact witness" (citation omitted)); *Donovan v. Bowling*, 706 A.2d 937, 941 (R.I.1998) (testimony by a treating physician is "entirely

---

1. DMG holds the contract to provide physicians for MMC's emergency department.

different from that of an expert retained solely for litigation purposes because a treating physician is like an eyewitness to an event and will be testifying primarily about the situation he or she actually encountered and observed while treating the patient").[2]

¶ 9 The State avowed in the superior court that, notwithstanding the broad-ranging questions it posed during the physicians' interviews, it will call the MMC doctors as trial witnesses "strictly regarding what they did to treat this child." Given this avowal, the question becomes whether the superior court, in ordering the State to compensate six of the physicians, viewed too narrowly the parameters of medical fact testimony. At oral argument, the court opined:

> [O]nce you start asking [the physicians] for things that are outside of what a lay person would have been able to testify to, if they were in that position, then they are entitled to be compensated.

> So if you are calling a doctor or a nurse just to say, you know, I saw the girl, her face appeared to be blue, she wasn't breathing, I went to the family. I told them that. The defendant said X, Y, Z. Those are all fact witness things.

> . . . .

> If you are going to ask them things that are outside of what a lay person could answer, that requires some specialized knowledge. When you get into how did you treat them, I think that necessarily is going to open up a can o[f] worms on why

did you do that? And that's going to require some expertise.

The superior court ruled it would not entertain trial objections regarding the scope of the physicians' testimony, but instead would engage in a post-trial, retrospective analysis of any compensation-related issues, stating:

> [T]he person who calls [the physician] pays them absent a showing of good cause which can be made after the trial is over. If it should be shifted, we can determine that at the end of the trial based on a transcript. If there is a disagreement about who should have to pay them, I will review the transcript and see who was using them as an expert.

■ ¶ 10 We adopt a simpler procedure that is more consistent with disclosure obligations in criminal cases and that provides increased certainty about what will transpire at trial. Prior to trial, the parties must determine and disclose the capacity in which the physicians will be called as trial witnesses. *See* Ariz. R.Crim. P. 15.1(b), 15.2(c); *see also State v. Roque*, 213 Ariz. 193, 207–09, ¶¶ 32–40, 141 P.3d 368, 382–84 (2006) (discussing State's disclosure obligations). These disclosures will then dictate the proper parameters of the doctors' trial testimony.

¶ 11 As previously noted, the State has avowed that it will call the six doctors at issue as fact witnesses. We assume that the physicians have factual information relevant to the criminal charges.[3] The challenge then becomes differentiating between factual testimony the witnesses may offer as treating physicians and expert testimony.[4]

---

**2.** Most of the cited decisions arise in the context of disclosures under Federal Rule of Civil Procedure 26(b)(4) or similar state rules of civil procedure. Although criminal cases are different in many relevant respects, these cases are nonetheless instructive. Nothing in this opinion, though, should be read as affecting disclosure obligations or witness compensation issues in civil cases.

**3.** According to the State, Dr. Connell will be called to testify about Lilliana's skull fractures and her finding that the child had normal bones and no developmental abnormalities. Dr. Gridley read scans of Lilliana's skull and would apparently be called to testify about his findings. Dr. Lezine was the pediatric emergency department attending physician; she prepared a report regarding Lilliana's condition upon admission and also contacted Child Protective Services.

Dr. Manwearing, a pediatric neurosurgeon, determined Lilliana's condition was grave and that surgery would be futile. Dr. Gonzalez–Cruz, a neurosurgeon, placed an intracranial pressure monitor in Lilliana. Dr. Rosenberg was the ICU attending physician; he spoke with Martinez and Lilliana's mother and oversaw the child's care until her death.

**4.** We decline to address the argument by *amicus curiae* Arizona Prosecuting Attorneys' Advisory Council that expert witnesses need not be compensated in criminal cases. The State itself has not clearly advanced such a claim. *See City of Tempe v. Prudential Ins. Co.*, 109 Ariz. 429, 432, 510 P.2d 745, 748 (1973) (holding that *amici curiae* are not permitted to create, extend, or enlarge issues beyond those raised by the parties). Rather, the State contends there is no

¶ 12 It is not possible to articulate a bright-line rule for determining when a treating physician crosses the line from fact witness to expert witness. However, we reject as overly broad DMG's position that its physicians must be treated (and compensated) as expert witnesses when any part of their testimony requires specialized knowledge obtained through professional education or work experience.

¶ 13 Both in the superior court and in this Court, DMG has focused on questions the State posed during its interviews that elicited information about the physicians' professional experience and specialization. DMG suggests such questions demonstrate the parties are using the doctors as expert witnesses. We conclude otherwise. Questions about a healthcare professional's background, experience, training, and specialization seek basic foundational information. They do not establish that the ensuing questions call for expert testimony. Such background information is relevant to jurors in assessing the credibility of fact witnesses and in determining the weight to give their testimony. It is appropriate questioning for a treating physician.

¶ 14 A fact witness typically testifies about information he or she has acquired independent of the litigation, the parties, or the attorneys. *See Schreiber v. Estate of Kiser*, 22 Cal.4th 31, 91 Cal.Rptr.2d 293, 989 P.2d 720, 723 (1999) ("[W]hat distinguishes the treating physician from a retained expert is not the content of the testimony, but the context in which he became familiar" with the medical information.); *see also Indem. Ins. Co. of N. Am. v. Am. Eurocopter L.L.C.*, 227 F.R.D. 421, 423–24 (M.D.N.C.2005) ("When the treating physician goes beyond the observations and opinions obtained by treating the individual and expresses opinions acquired or developed in anticipation of trial, then the treating physician steps into the shoes of an expert...."). Other than reviewing his or her own records, a medical fact witness will not usually be required to perform additional work, investigation, or review in order to answer questions.

¶ 15 Asking a treating physician the "who, what, when, where, and why" regarding his own patient and medical records will generally elicit fact-based testimony. Similarly, questions calling for information the physician has derived from one of the five senses, e.g., what the doctor saw, heard, or felt in treating a patient, will typically be appropriate. *Cf. State v. Boling*, 840 S.W.2d 944, 949 (Tenn.Crim.App.1992) (first-hand knowledge is that perceived through one or more of the five senses).

¶ 16 Conversely, questions that require a physician to review records or testimony of another health care provider or to opine regarding the standard of care or treatment given by another provider are generally inconsistent with the role of treating physician as fact witness. *See, e.g., Wreath v. United States*, 161 F.R.D. 448, 450 (D.Kan. 1995) ("[A] treating physician requested to review medical records of another health care provider in order to render opinion testimony concerning the appropriateness of the care and treatment of that provider would be specifically retained notwithstanding that he also happens to be the treating physician."); *Pete v. Youngblood*, 141 P.3d 629, 635 (Utah Ct.App.2006) (if a "treating physician also offers an opinion as to the standard of care or whether that standard has been breached, the testimony is no longer simply factual"). Similarly, questions that require a physician to discuss medical research or literature will typically call for expert, not fact-based, testimony.

¶ 17 Hypothetical questions will often, though not invariably, signal that expert testimony is being elicited. A question posed to Dr. Connell during the pretrial interviews illustrates this point. She was asked: "If you had a child that did have some sort of demineralization of the bone and say that child did sustain a skull fracture, would you necessarily expect to see brain injury as well?" Although we lack the full context for this question, if asked at trial, the response likely would exceed the bounds of fact-based

requirement for "payment from State coffers for a witness under subpoena solely for his or her

time spent testifying, or preparing for trial *as a fact witness.*" (Emphasis added.)

testimony. The record suggests the MMC doctors found no bone demineralization; thus, asking them to assume the existence of such a condition necessarily would require them to opine about circumstances unrelated to Lilliana's actual treatment. Generally speaking, a witness asked to form an opinion for purposes of testifying is providing expert testimony. On the other hand, a physician who testifies as to an opinion he or she formulated in the course of treating a patient is generally providing factual information.

¶ 18 The superior court labeled questions about Lilliana's diagnosis and the reasons for that diagnosis a close call. We conclude, though, that these are appropriate factual inquiries directed to a physician witness who actually developed a diagnosis during the course of treatment.

¶ 19 DMG also raises concerns about pretrial interview questions focusing on causation, stating:

> In regard to causation, the prosecutor asked Dr. Connell "what type of circumstances would you see similar fractures from?" The defendant's counsel asked Dr. Gridley, "are there any conclusions that you can draw to a reasonable medical certainty based on these records as to the cause of these injuries?" The State followed up, asking Dr. Gridley, "would you be able to indicate whether or not the cause of that was from trauma?" Dr. Rosenberg was asked the same questions. Dr. Lezine was asked about the possibility that the injuries were "caused" by a short fall of[f] a bed and what literature supported her answer.

(Internal citations omitted.)

¶ 20 In the superior court, the prosecutor avowed that the MMC doctors will not be questioned at trial about "the mechanism of the injury." The issue of causation thus may be largely academic. We nevertheless agree with DMG that the above-quoted questions delve into areas reserved for expert witnesses *unless* the physicians drew such conclusions in treating Lilliana. An entry in the medical records illustrates this distinction. Dr. Lezine apparently wrote that Lilliana's injuries were inconsistent with Martinez's version of events. Such an opinion, clearly developed during the course of the child's treatment, constitutes fact-based testimony. DMG acknowledged as much at oral argument. So while causation questions bearing on culpability for an injury will typically implicate a medical professional's expertise, such inquiries may be fact-based in a particular case if the professional formed such opinions in treating a patient. *Cf. Day v. McIlrath*, 469 N.W.2d 676, 677 (Iowa 1991) ("[A] treating physician ordinarily focuses, while treating a patient, on purely medical questions rather than on the sorts of partially legal questions (such as causation or percentage of disability) which may become paramount in the context of a lawsuit.").

¶ 21 DMG also complains that its physicians "were asked to explain or to 'educate' the parties' attorneys on multiple medical issues in 'laymen's terms.' " We see nothing wrong with asking medical fact witnesses to explain terms or procedures in a manner that the trier of fact may more easily comprehend. Nor are we persuaded by DMG's suggestion that the State forego calling the MMC physicians and instead rely on its retained forensic pediatrician to "utilize information from *all* the medical practitioners and the medical records" for purposes of trial. We instead agree with the following observation regarding potential qualitative differences in the two types of testimony:

> Fairness is jeopardized when courts unnecessarily prevent the introduction of highly probative evidence from being heard by jurors. The testimony of a treating physician is, by its nature, often more relevant, material, and probative, than that of the retained expert who is not only paid for his testimony but often gleans it from a cold record.

Christopher W. Dyer, *Treating Physicians: Fact Witnesses or Retained Expert Witnesses in Disguise? Finding a Place for Treating Physician Opinions in the Iowa Discovery Rules*, 48 Drake L.Rev. 719, 739 (2000).

¶ 22 Finally, DMG's reliance on the 1992 State Bar of Arizona *Guidelines for Interprofessional Relationships in Legal Proceedings* is unpersuasive. These voluntary pro-

fessional guidelines were designed with the laudable goal of improving medical-legal relationships and are obviously tailored to civil litigation. They are not binding legal authority in any setting and are particularly unhelpful in the context of a criminal case.[5] Moreover, the Guidelines recognize that a physician has "an obligation as part of his or her civic responsibility to participate in the legal process when there are questions about a patient/client to whom the health care provider has provided treatment." *Id.* at 7; *see also Blair v. United States,* 250 U.S. 273, 280, 39 S.Ct. 468, 63 L.Ed. 979 (1919) (noting that the "personal sacrifice involved [in testifying] is a part of the necessary contribution of the individual to the welfare of the public").

## CONCLUSION

¶ 23 We cannot anticipate and address the myriad of questions that might be posed to the physician witnesses at trial. Assuming, though, that the MMC doctors are called as fact witnesses, as the State has avowed, counsel must limit their questions accordingly. Although a physician who is disclosed as a fact witness may not be compelled (or allowed) to give expert testimony over a party's objection, depending on the issue, the opposing party may not object at trial to a question that in fact elicits expert testimony. In that event, a treating doctor, who typically will be unrepresented, understandably may be reluctant to protest that he or she has not been retained to answer questions seemingly related to a young victim's care. In such a circumstance, the witness may simply respond that he or she has not been asked to serve as an expert witness or to formulate opinions beyond those reached during the patient's treatment. Trial judges should also be vigilant, and, where necessary, take steps to protect medical fact witnesses from improper incursions into their expertise. Motions in limine may also be helpful in resolving such matters.

¶ 24 For the reasons stated, we accept jurisdiction and grant relief from the superior court's order.

CONCURRING: DIANE M. JOHNSEN, Presiding Judge and JON W. THOMPSON, Judge.

---

5. Interestingly, the Guidelines espouse a narrower view of expert testimony than DMG advocates, defining an expert witness as one "giving opinions on matters which require analysis beyond the treatment record." *Id.* at 8.