# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 7, 2003 Session

## STATE OF TENNESSEE v. CARLTON LEE McALISTER

**Direct Appeal from the Circuit Court for Carroll County**
**No. 20CR1620     C. Creed McGinley, Judge**

---

**No. W2002-00454-CCA-R3-CD  - Filed April 3, 2003**

---

The defendant appeals his conviction for DUI - second offense and his sentence of sixty days. The defendant contends the evidence is insufficient to sustain his conviction, more specifically that he was not impaired while driving or on a public road.   The defendant also argues that his sentence of sixty days is excessive.  We conclude the evidence is sufficient to sustain his conviction.  The defendant failed to include the sentencing hearing transcript, thus barring this Court from reviewing his argument concerning sentencing.  We affirm the judgment from the trial court as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed as Modified**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Benjamin S. Dempsey, Huntingdon, Tennessee, for the appellant, Carlton Lee McAlister.

Paul G. Summers, Attorney General and Reporter; John H. Bledsoe, Assistant Attorney General; G. Robert Radford, District Attorney General; and Eleanor Cahill, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant appeals his conviction for DUI  - second offense.  At the conclusion of his sentencing hearing, the defendant was sentenced to ll months, 29 days.  The trial court ordered the defendant to serve 60 days in the county jail with the remainder on supervised probation. The trial court suspended the defendant's license for two years and fined him six hundred dollars ($600). The defendant raises sixteen issues for our appellate review.  We conclude that issues (1), (2), (3) (4), (9), (11), (12), (13), and (16) all concern the sufficiency of evidence and are addressed accordingly. Issues (7) and (8) concern sentencing and are addressed as such.  Issues (5), (6), (10), (14), and (15)

are not supported by an argument with citations to authorities and appropriate references to the record; therefore, they are deemed waived. See T.R.A.P. 27(a)(7).

## I. Facts

Charles Brey testified that he owns a trailer park in Carroll County which consists of eleven trailers and one house, located on Charles Lane and Patsy Lane. He described and exhibited a sketch of his property. He said that a lady associated with "911" emergency systems came out to the trailer park and named the streets. He said that each trailer and the house has its own street number. He said that the defendant rents a trailer from him on Patsy Lane. He said that during the evening hours of July 21, 2000, he received a disturbance call against the defendant.[1] He said that when he got to the trailer park, he saw the defendant come out of his trailer and get into his vehicle. He said the defendant "cranked up" his vehicle, backed down Patsy Lane and pulled up to the foot of Fesmire Road. He said the defendant then backed up to the defendant's trailer.

On cross-examination, Mr. Brey testified that the defendant lives on Patsy Lane, which is also considered the defendant's driveway. He said that Patsy Lane is not a public road, and he maintains the road. He said that Fesmire Road, which is a paved road in front of the trailer park, is maintained by the county. He said that he did not see the defendant drive up and down Fesmire Road. He said he drew a sketch of his property because he wanted to measure it and said the sketch shows how the trailer park has one entrance, then forks off with two trailers on one fork and two trailers on the other fork. He said the "911" person who named the streets is not associated with the county. The defense counsel asked Mr. Brey to look at some pictures and tell what they depicted. He said the pictures depicted the defendant's truck and its location on the night of the disturbance. He said garbage pickup and mail delivery take place on Fesmire Road. He said that the only people that drive down the roads in the trailer park are those people who live there. He said that he saw the defendant's vehicle around 11:00 p.m. or 11:30 p.m. He said the defendant did not appear to have problems driving. He said he has called the Sheriff's Department a few times to have them come out to the trailer park to help him "support the laws on some of the driveways."

On redirect-examination, Mr. Brey testified that he maintains the roads in the trailer park for the occupants. He said that guests of the trailer park also use those roads. He said he received the complaint on the defendant, arrived about ten minutes before the officers arrived, and left when the officers did. He said that he sees the defendant from time to time, and he does not always see him using a walking cane. On recross-examination, Mr. Brey testified that he knew the defendant sometimes walks with a cane. He said the defendant says he goes to the V.A. for his medical problems. He said the defendant walks with a limp.

---

[1] The identity of the caller to the Carroll County Sheriff's Department is unknown. The defendant testified that someone called to report that he "had cut his arms all to pieces and was trying to kill himself." Throughout the trial, the basis of the initial call is not discussed.

Sergeant Jeff Hopper, shift supervisor with the Carroll County Sheriff's Department, testified that he answered a call around 11:00 p.m. or 11:30 p.m. on the night of July 21, 2000, to respond to a complaint at the intersection of Patsy Lane and Fesmire Road. He said that when he arrived on the scene, the defendant was inside his residence. He said that he and Deputy Mark Hedge, who arrived on the scene after him, talked to Mr. Brey for a while. Sergeant Hopper said he saw the defendant's porch light initially come on when he arrived, but the light went out as they spoke to Mr. Brey. He said he thought the defendant was going to go inside to sleep, but the defendant came out and got into his vehicle. He said the defendant got into an older model Chevrolet pickup truck, started it, and proceeded to leave the residence. He said that he walked back to his car, and as the defendant approached the intersection of Patsy Lane and Fesmire Road, he initiated his blue lights and blocked off the exit. He said the defendant stopped and backed up to his residence. He said that when he spoke to the defendant, he noticed the defendant reeked of alcohol and slurred his speech. He said he gave the defendant a nine-steps heel-to-toe and a one-legged stand sobriety tests. He said the defendant did not advise him of his physical problems. He said the one-legged stand is a standardized test where the person holds his foot, of either leg. He said the test subject is to keep the foot off the ground and six inches from a stationary object and then count from 1001 to 1030. He said the quicker the test subject messes up, the more intoxicated he is. He said the defendant did very poorly in that he might have counted to 1003, 1004 with his foot on the stationary object. He said the defendant did not complete the nine-steps heel-to-toe test. He said that in his opinion, the defendant was very intoxicated. He said he placed the defendant under arrest for driving under the influence (DUI) and took the defendant to the Carroll County Jail. He said he had the defendant complete the sobriety test again on video camera, and even though he did better than what he did at the residence, he still failed the test. He said that the defendant never made him aware that he was on medication or had any physical defect. He said it was the policy of the Carroll County Jail to videotape DUI suspects. The tape was played for the jury and entered into evidence.

On cross-examination, Sergeant Hopper testified that the defendant performed poorly on both sobriety tests. He said he offered the defendant the Implied Consent form and read it to the defendant. He said the form explains that the defendant could take the Breathalyzer test or blood alcohol test. He said the defendant refused to take a test. The prosecution entered the Implied Consent form into evidence. He said the defendant was not walking with a cane nor did he try to get a cane to walk with. He said the defendant never told him that he had any injury or had just taken medication and should not be out.

On cross-examination, Sergeant Hopper testified that at General Sessions he could not recall whether it was Deputy Doug Pate or Deputy Mark Hedge that accompanied him to the call on the night of the offense. He said that Deputy Hedge was the officer that responded to the call with him. He said that the nine-step field test is a standardized test, and he knew that the terrain was unlevel and rocky. He said he would not base everything on the sobriety test. He said that the terrain would have some bearing on how the defendant would have performed. He said he observed the defendant driving, but it was not like a regular DUI where you follow someone. He said the defendant did not run off the road or hit anything. He said that Deputy Hedge was not a witness to either sobriety test. He said that the defendant smelled of beer, and he saw some empty cans of Milwaukee's Best beer

in the defendant's vehicle. He said the defendant had a cane in his vehicle, but he did not ask for the cane while he completed the field sobriety tests. He said the defendant did not ask for a blood alcohol test. He said he did not ask the defendant if he was on medications or suffered a disability. On redirect-examination, Sergeant Hopper testified he did not know whose cane was in the truck.

Deputy Mark Hedge of the Carroll County Sheriff's Department testified that he was called as a backup for Sergeant Jeff Hopper on the night of the offense. He said he saw the defendant perform field sobriety tests, and it appeared the defendant was too intoxicated to be driving. He said he did not see the defendant walk with a cane. He said he saw several empty Milwaukee's Best beer cans in the defendant's vehicle. He said he did not accompany Sergeant Hopper to the Carroll County Jail. He said he had been out to Brey's Trailer Park on a call before and was familiar with Patsy Lane and Charles Lane. He said they arrived between 12:00 and 12:30 a.m. He said Sergeant Hopper was in front of him when he arrived on the scene. He said he and Sergeant Hopper parked at the side of Patsy Lane and Fesmire Road. He said they got out of their cars and walked up to the rental house belonging to Mr. Brey. He said that the defendant was in his house when he arrived on the scene. He said he observed a porch light on at the defendant's trailer, the light then went out, and then the porch light came back on. He said the defendant came back out of his trailer and got into his truck. He said the defendant proceeded on to Fesmire Road, off of Patsy Lane, in his late model Chevrolet truck. He said the defendant stopped and then backed up toward his trailer. He said the defendant got out of his truck after being asked by Sergeant Hopper and started performing the field sobriety tests. He said the defendant was "wavy and pretty staggery" on the nine-step heel-to-toe field sobriety test. He said the surface of the ground was covered with grass and gravel, and the defendant was unsteady on his feet. He said the terrain was not unlevel or rough. He said the defendant did not mention a cane or any disability. He said he did not ask him if he had any problems or takes any medications. He said an injury or some medications would adversely impact these field tests.

Scotty Bailey, Carroll County Road Supervisor, testified that he works Fesmire Road. He said that Fesmire Road is a county-maintained road, while Patsy Lane is not. On cross-examination, Mr. Bailey testified that Patsy Lane and Charles Lane are on the county maps. He said he guessed that Mr. Brey maintained the roads in his trailer park. On redirect-examination, Mr. Bailey testified that he has not seen any signs out in that area designating it as a trailer park. He said there are just sporadic trailers up and down Fesmire Lane. He said he has not paid attention to the trailers on Patsy Lane and Charles Lane, because he works only the county roads. He said he has nothing to do with private roads. He said there are some roads in that area with road names, but they are not county roads. He said the map does not indicate ownership of the roads.

The defendant testified that on the afternoon of July 21, 2000, he had trouble with the linkage in his '64 Chevy truck. He said that around six o'clock in the evening, he test drove his Chevy several times to test the linkage. He said he went back outside around 11:15 p.m. to test the linkage one last time by pulling up the driveway and backing up. He said that he suffered a spinal cord injury when he was in the military and has to take several medications. He said he takes Amitriptyline, which is also known as Elavil, at nighttime to help him rest. He said he took the

Amitriptyline at about 11:15 p.m. and then went outside to try his truck. He said that normally he would be in bed at that time. He said the Amitriptyline was steadily putting him to sleep the whole time. He said he got into his truck and drove about halfway up the driveway, to the fork in the road, and then backed up. He said he backed up to the trailer, pulled back in his driveway, and saw two cars coming. He said he had already gotten out of his truck and started around the back of the truck. He said that one of the officers told him over the loudspeaker to get back into his truck. He said he got back into his truck, and one of the officers told him that he smelled like alcohol and told him to get out of his truck. He said he told the officer that he needed to get his cane, and the officer told him he considered the cane a deadly weapon. He said that the officer told him he did not need his cane. He said that he told the officer that he had been taking some night medication and that earlier, he drank one beer over a four-hour span. He said he told the officer that the medication would put him to sleep after awhile, and the officer told him that he was DUI. He said the officer told him he was going to take him in and allowed him to lock his front door before taking him to the Sheriff's Department. He said that on the way to the Sheriff's Department, the officer told him that he knew the defendant would pull out on Fesmire Road because he knows "what white trash thinks." He said that he tried to do the best that he could at the Sheriff's Department because the medicine was steadily making him drowsy. He said that he wanted the officer to take him to the hospital to have a blood test so the test would prove that he only had medicine in his system. He said the officer told him that he "didn't have time to fool with him" and threw him in the drunk tank. He said that it was 1:00 a.m. when he was asked to perform the sobriety test, and he usually goes to bed no later than midnight. He said he took his sleep medication around 11:15 p.m. He said he wanted to go outside to test his truck one more time before bed to see if the synchronizer was kicking in. He said he has had problems with his transmission in the past and has had to replace it four times in five years. He said he is on disability that is 60% service-connected for a spinal cord injury. He said he did not know what type of spinal cord injury he had, but said that he fell eight feet, head first, off of a telecommunications vehicle in the service in 1989. He said that when he hit the ground, his spinal cord was like a shock absorber, resulting in the removal of two discs. He said he suffers from Fibromyalgia and has a seven-inch long steel plate in his ankle. He said that these injuries and the medications he took interfered with his performance on the field sobriety tests. He said he would have performed better on the field sobriety tests if he had the use of his cane.

The defense counsel asked the defendant to look at photographs of the scene and explain to the jury what the photos depicted. The defendant pointed to a photo and testified to where he lived in relation to his driveway. The defendant testified that his driveway is roughly 235 feet to the center of Fesmire Road. He said he pulled his truck up to the point where the forks meet, which is 125 feet from his driveway. He said he backed down to the trailer before he saw headlights come up his driveway.

On cross-examination, the defendant testified that he lived on Patsy Lane in the trailer park. He said that he has to pass one trailer on the corner of Fesmire and Patsy Lane to get to Fesmire Road. He said that there are two Patsy Lanes that dead end in the trailer park. He said he did not know that the police were at the trailer park when he pulled halfway up his driveway and backed up. He said that the police hid behind bushes on Fesmire and did not walk up to his trailer. He said he

was not planning to go anywhere when he got into his truck and that he was only trying to check the linkage on his truck. He said that he does not work because of his health and takes Amitriptyline and stomach pills. He said that he did not have anywhere to go the morning after the arrest and that four days later, he went to his appointment at the V.A. He said the reason he was so diligent about working on his truck was so that he would make it to his doctor's appointment. He said that he had no cans in his truck, and he would never drink a Milwaukee's Best. He said that while he was outside at 6:30 p.m. or 7:00 p.m., he had one beer which had been in the refrigerator. He said that he drank the beer, got in his recliner, and went to sleep. He said that he woke up and realized that he needed to take his night medicine and try his truck one last time. He said somebody called and said that he had "cut his arms all to pieces" and was trying to kill himself. He said he did not take a field sobriety test at his house. He said that at the jail his speech was getting slower and slower due to the Amitriptyline. He said he was getting drowsier and drowsier due to the Amitriptyline. He said the officer's car never blocked the road.

At the conclusion of trial, the jury found the defendant guilty of DUI, a Class A misdemeanor. The record reveals the defendant stipulated he had a prior DUI conviction, making this a conviction for DUI - second offense. The judgment form reflects that this is a conviction for DUI; however, the trial court stated at the conclusion of trial that the defendant was convicted for DUI - second offense. After a sentencing hearing, the defendant was sentenced to 11 months, 29 days. The trial court ordered the defendant to serve 60 days in the county jail, with the remainder on supervised probation. The trial court suspended the defendant's license for two years and fined him six hundred dollars ($600). We remand for the correction of the judgment form to reflect that the defendant was convicted of DUI - second offense.

## II. Analysis

The defendant alleges that the evidence was insufficient to support his conviction for DUI. When a defendant challenges the sufficiency of the evidence, the standard is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); Tenn. R. App. P. 13. This standard is applicable to findings based on both direct and circumstantial evidence. State v. Thomas, 755 S.W.2d 838, 842 (Tenn. Crim. App. 1988).

It is well established that a jury verdict, approved by the trial court, accredits witness testimony for the State and resolves all conflicts in favor of the theory of the State. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Townsend, 525 S.W.2d 842, 843 (Tenn. 1975). In determining the sufficiency of the evidence, this Court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). A verdict of guilt removes the presumption of innocence from the defendant and replaces it with a presumption of guilt, and on appeal, the defendant's burden is to demonstrate why the evidence is insufficient to support his guilty verdict. State v. Carruthers, 35 S.W.3d 516, 557-58 (2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

Tennessee Code Annotated section 55-10-401(a)(1) provides that "it is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large, while (1) Under the influence of any intoxicant, marijuana, narcotic drug, or drug producing stimulating effects on the central nervous system; or (2) The alcohol concentration in such person's blood or breath is ten-hundredths of one percent (.10%) or more."[2]

In the instant case, after viewing the evidence in the light most favorable to the State, sufficient evidence exists to establish the defendant was under the influence while operating his vehicle. Two officers testified to viewing the defendant driving and smelling the strong odor of alcohol on the defendant. The officers testified they witnessed the defendant perform poorly on field sobriety tests. Furthermore, the jury witnessed the defendant perform field sobriety tests on videotape. The defendant admitted to taking a prescription sleep-aid and drinking one beer earlier, before getting in his car and driving down Patsy Lane within the trailer park. The defendant stated that he became drowsier by the minute as he drove down Patsy Lane and during the field sobriety tests.

The defendant further argues that the evidence is insufficient to sustain his DUI conviction, because he was not on a public road and was driving his vehicle on his own private driveway. Tennessee Code Annotated section 55-10-401(a) provides that it is unlawful to drive under the influence on any of "the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or any apartment house complex, or any other premises which is generally frequented by the public at large." "A jury verdict approved by the trial judge accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the State's theory." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Whether the defendant traveled upon a public or private road is a question for the jury. In State v. Hiner, this Court rejected a similar argument when it concluded that evidence was sufficient to support the defendant's DUI conviction where the defendant drove while under the influence of an intoxicant within the streets of a gated subdivision. State v. Hiner, 988 S.W.2d 697, 700 (Tenn. Crim. App. 1998).

Testimony reveals the defendant drove his vehicle from his trailer down to the intersection of Patsy Lane and Fesmire Road, both of which are included on maps of Carroll County. The record includes sketches of the trailer park, which illustrate the location of the defendant's home in relation to other homes in the area. The sketches and trial testimony support the State's assertion that Patsy Lane is not a private driveway. The defendant's home is not the last home located on Patsy Lane. The record reveals the defendant drove down Patsy Lane, a road accessible and frequented by occupants of homes located on Charles Road. Moreover, Patsy Lane is utilized by the occupants of five different homes from the entrance of the trailer park at Fesmire Road. Therefore, the evidence

_____

[2] The defendant was not charged with having a blood alcohol content of ten hundredths of one percent (.10%) or more.

supports the State's contention that Patsy Lane is not exclusively used by the defendant and is accessible by the other occupants of the homes, their guests, invitees, and the public at large. Nothing in the record suggests the defendant had exclusive control over Patsy Lane within the confines of the Brey Trailer Park.

From these facts, in the light most favorable to the State, we conclude that there is sufficient evidence for a rational trier of fact to find the defendant was driving on a public road while under the effects of an intoxicant and, therefore, is guilty beyond a reasonable doubt.

Next, the defendant argues that his sentence is excessive. The defendant argues that the trial court erroneously enhanced the defendant's sentence based upon an uncounseled prior DUI conviction and failed to properly apply mitigating factors. The defendant argues the State failed to prove the existence of an enhancing conviction.

In misdemeanor sentencing, a separate sentencing hearing is not mandatory, but the trial court is required to allow the parties a reasonable opportunity to be heard on the question of the length of the sentence and the manner in which it is to be served. Tenn. Code Ann. § 40-35-302(a). The sentence must be specific and consistent with the purpose and principles of the Criminal Sentencing Reform Act of 1989. Tenn. Code Ann. § 40-35-302(b). A trial court is not required to place specific findings on the record with regard to sentencing determinations, as required for felony sentencing under Tennessee Code Annotated sections 40-35-209(c) and 40-35-210(f). State v. Troutman, 979 S.W.2d 271, 274 (Tenn. 1998). Misdemeanor sentencing is designed to provide the trial court with continuing jurisdiction and greater flexibility. See State v. Troutman, 979 S.W.2d 271, 273 (Tenn. 1998); State v. Baker, 966 S.W.2d 429, 434 (Tenn. Crim. App. 1997). Unlike felony sentencing, defendants are not entitled to a presumptive minimum sentence in misdemeanor sentencing. See State v. Creasy, 885 S.W.2d 829, 832 (Tenn. Crim. App. 1994).

It is this defendant's duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. State v. Ballard, 855 S.W.2d 557, 560 (Tenn. 1993); T.R.A.P. 24(b). In this case, the defendant has failed to include in the record a transcript of his sentencing hearing, which is essential for appellate review. When faced with an incomplete record on appeal, we must presume that the ruling of the trial court is correct. State v. Boling, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992).

### III. Conclusion

Accordingly, we affirm the defendant's conviction and sentence imposed in the trial court. We remand to the trial court to reflect the proper charge of DUI - second offense.

_____
JOHN EVERETT WILLIAMS, JUDGE