IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 13, 2016

## STATE OF TENNESSEE v. JEREMY L. SAXTON

**Appeal from the Criminal Court for Sumner County
No. 4592011 Dee David Gay, Judge**

_____

**No. M2015-01380-CCA-R3-CD – Filed November 15, 2016**

_____

Defendant, Jeremy L. Saxton, was convicted of one count of assault and one count of resisting arrest. As a result of the convictions, Defendant received judicial diversion with probation for eleven months and twenty-nine days. After the denial of a motion for new trial, Defendant filed a timely notice of appeal. Upon our review we determine that Defendant was not entitled to an evidentiary hearing on the motion to suppress because there was no evidence to suppress. Further, we conclude that the record on appeal is incomplete, precluding our review of the sufficiency of the evidence. Consequently, the judgments of the criminal court are affirmed and the matter is remanded for correction of a clerical error.                       .

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Patrick G. Frogge, Nashville, Tennessee, for the appellant, Jeremy L. Saxton.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Ray Whitley, District Attorney General; and Bryna Grant, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On August 25, 2014, Defendant was arrested after an incident at a Mapco station in Portland, Tennessee. Defendant was ultimately indicted by the Sumner County Grand

Jury for four counts of assault and one count of resisting arrest. Prior to trial, Defendant filed a motion to suppress on the basis that his seizure was illegal.

*Proof at Hearing on Motion to Suppress[1]*

At the hearing on the motion to suppress, David Alessio[2] testified that on August 25, 2014, at around 8:00 or 9:00 p.m., he and his wife went to the Food Lion in Portland. Mrs. Alessio[3] remained in their truck in the parking lot while Mr. Alessio went into the store. Mr. Alessio was in the checkout line when he received a call from his wife who told him "something was going on out in the parking lot" and that he should "hurry." Not long thereafter, Mr. Alessio saw two "girls" walk in the grocery store "making a scene." One of the "girls" was "basically hollering at the other girl."

Mr. Alessio left the store and returned to his truck. Mrs. Alessio told him she thought that there was a "fight." The couple decided to sit in their truck in the parking lot for a minute to see what was going on. The two "girls" exited the store. One of them was talking on her cell phone. Mr. and Mrs. Alessio saw Defendant "jump[] out of the car real quick and walk[] around to the back of the car" before "turning" toward one of the "girls." The Alessios saw Defendant point his finger at the "girl" before all three of them got back in the car and drove through the grocery store parking lot toward the Mapco.

By that time, Mr. Alessio had already called the police because he thought it "was a domestic [disturbance]." The police responded to the call and were directed to the gas station. Officer Shaun Burgett with the Portland Police Department responded to a dispatch report of a "possible domestic in progress." Officer Burgett explained that it was typical for "two [officers]—up to as many as available—[to respond to a domestic call be]cause we don't know what's gonna [sic] happen. . . ." He thought that six officers responded to this particular call. When he arrived at the Mapco, he positioned his vehicle

---

[1] During the hearing and the trial, Defendant was indigent. Additionally, the matter was a misdemeanor and there was not a court reporter present. Counsel for Defendant made an audio tape of the proceedings in anticipation of the preparation of a statement of the evidence for appeal purposes. Once the recording was reviewed, it was discovered by counsel that the witnesses could be heard with remarkable clarity. Therefore, instead of submitting a statement of the evidence, a member of counsel's support staff transcribed the audio recording and submitted it to the trial court for certification. Initially, the State objected to the transcripts but their motion was stricken by the trial court.

[2] The witness's name is spelled "Alessio" and "Alesio" in the transcripts provided to this Court as part of the technical record. For consistency, we will refer to the witness as Mr. Alessio, the spelling utilized first in the record.

[3] Mrs. Alessio is not identified by first name in the transcript.

2

"in the front near the pumps" so that he could block Defendant's vehicle if he tried to leave. Other officers were situated in other locations around the gas station. He described the parking lot and gas pump area as "full." He received information on the description of the vehicle and Defendant from dispatch.

Officer Burgett located a car and subjects matching the descriptions provided by dispatch. As he approached Defendant, he explained that he was "an officer with the police department" and asked if there was "a white female in the back crying" and also asked if they just came from the Food Lion. When Defendant responded affirmatively, Officer Burgett informed Defendant that they received a 911 call for a "possible domestic" and that they fit the description of the people involved.

Officer Burgett asked Defendant to exit the vehicle. Officer Burgett testified that he asked Defendant to step out of the vehicle for "safety reasons" because the vehicle was running and because Defendant could be concealing a weapon in the vehicle. Additionally, Officer Burgett wanted to separate the parties so that they could not hear or see each other while the officers investigated the situation to determine if there was indeed some type of domestic dispute taking place.

Defendant refused, telling Officer Burgett, "No, I'm not getting out[.] I've done nothing wrong." Officer Burgett again asked Defendant to exit the vehicle. Defendant told Officer Burgett, "F--- you, I'm not getting out." Officer Burgett then opened the door to the vehicle. He informed Defendant that he had asked twice for him to get out of the vehicle and that he would not ask again. Officer Burgett told Defendant, "Get out or I'm going to get you out." Officer Burgett saw Defendant "leaning in to the center console" and was not sure what Defendant was reaching for or doing so Officer Burgett "reach[ed] in to try to gain access to him [be]cause [he didn't] know if he was gonna [sic] drive off [or had a weapon]." Officer Burgett "grabbed the crook of [Defendant's] left arm" with his right hand and Defendant's wrist with his left hand. Defendant took "his left arm, his elbow, threw it at [Officer Burgett] and tried to push off of [him] and then pull back."

Officer Burgett went on to testify that the entire scenario—the female in the backseat crying, Defendant's refusal to comply with the officer's request to exit the vehicle, the report of a possible domestic disturbance, and the potential threat to the public at the crowded gas station—"le[]d [the officer] to believe that [Defendant] could have been angry towards [the female in the backseat] and an assault could have [taken] place."

Defendant did not present any testimony at the hearing on the motion to suppress. At the conclusion of the hearing, the trial court recounted the facts and found that, at the point Officer Burgett approached the vehicle, there were "reasonable, specific, articulable

facts" of a "possible domestic in progress" which supported the officer's actions. The trial court determined that the officer "g[o]t another additional [ground for] reasonable suspicion here—the police officer goes up to this vehicle as in a caretaking function and as a consensual encounter and finds that the female is in fact crying—she's crying in this vehicle that had been identified." The trial court determined that after asking Defendant twice to exit the vehicle, the officer had specific and articulable facts to seize Defendant. However, the trial court noted that the seizure was "barely" constitutionally sufficient, pointing to:

> the fact that the female was in the back crying – . . . the possible domestic in progress – the fact that the vehicle was running – the fact that Defendant was asked to get out of the car – the fact that he said "F you" – that adheres to the possibility that something here stronger than "I just don't want to do it" – it crosses the line as to "I've done something wrong – possibly done something wrong and I'm not going to do anything. . . ."

*Proof at Trial*

At trial, Mr. Alessio's testimony mirrored his testimony at the suppression hearing. Mr. Alessio additionally recalled that he watched the confrontation between Defendant and the police from about twenty feet away. He observed that an officer approached Defendant's vehicle and spoke with Defendant through the rolled-down window. The officer asked Defendant to get out of the vehicle. Defendant refused and the officer repeated the request. Mr. Alessio looked away to talk to his wife. When he looked back, Defendant was on the ground. Mr. Alessio testified that the woman who had been seated in the back seat of the vehicle was also outside the vehicle by the time Defendant was on the ground. Mr. Alessio heard the officers tell Defendant to "quit resisting" and the woman in the back seat said that Defendant "didn't do anything."

Officer Burgett also testified at trial. He commented that police response to a "possible domestic" disturbance was "[o]ne of the most difficult and dangerous [situations] because everybody is already in a heightened state." When he arrived at the Mapco, Officer Burgett approached the vehicle with caution, identifying himself as a police officer responding to a 911 call. He asked Defendant to exit the vehicle. He thought that other officers asked the woman in the back seat to get out of the vehicle. Officer James Bartolotta was stationed on the passenger side of the vehicle with Officer Carlos Cruz. Officer Bartolotta saw Officer Burgett motion for Defendant to exit the vehicle. Officer Burgett explained that the officers wanted to separate the parties for safety and to determine what was actually happening. Officer Burgett again asked Defendant to exit the vehicle. Defendant responded, "F--- you. I'm not getting out of the car. I [haven't] done nothing wrong." Officer Burgett described Defendant's demeanor as "aggressive."

4

Officer Burgett opened the door to Defendant's vehicle and told him to "please step out of the vehicle" or he would "come in and get [him]." Defendant leaned toward the center console. Officer Burgett thought that Defendant was "getting something or [was going to] drive off—so [he] reach[ed] in and grab[bed] his arm to try to control him. . . ." Defendant used his elbow to strike at the officer. Officer Cruz stepped around from the passenger side of the vehicle to help Officer Burgett remove Defendant from the vehicle. Officer Cruz attempted to "subdue" Defendant's legs because Defendant was kicking. Officer Burgett lost his grip on Defendant. By that time, Officer Bartolotta had walked to the driver's side of the vehicle. Officer Bartolotta stepped in to try to gain control over Defendant because he "wanted to make sure that there [were] no weapons" accessible to Defendant in the vehicle. Officer Bartolotta "got hold of [Defendant's] arm . . . trying to do arm rotate to take him . . . to the ground." Defendant would not comply, "aggressively jerked forward and then jerked backwards," causing Officer Bartolotta to lose his balance and fall to the ground. Officer Burgett saw Defendant's arm "come up in the same manner" as it did earlier towards his face immediately before Officer Bartolotta fell to the ground, but he did not see Defendant strike Officer Bartolotta. Defendant was being told to comply with the officers but he would not "stop resisting."

Corporal Dennis Dalbec was observing the interaction from his patrol car parked in the Mapco parking lot. When he saw Officer Burgett open the door to Defendant's vehicle and the "scuffle" begin, he exited his patrol car and ran to the scene "before the situation escalated." Defendant was "actively resisting physically," and the situation needed to have "an end" because he "feared for the interests of the officers. . . [f]eared for the interests of [Defendant] . . . feared that if we didn't get the situation under control immediately that he could possibly put the vehicle in gear and flee the scene which put everybody else in jeopardy in the parking lot." Corporal Dalbec used his taser on Defendant. Defendant started screaming that he had a hernia. Defendant "kicked" Corporal Dalbec in the chest. It "jolted" Corporal Dalbec and "shoved" him back but did not injure him. Corporal Dalbec grabbed Defendant by the legs and "pull[ed] him out of the car." Officer Cruz tried to grab Defendant by the feet to get him out of the vehicle. Defendant was kicking at the officers but still remained in the vehicle. Officer Cruz got kicked in the chest by Defendant. He was not injured. The first taser use was initially effective until Defendant started "actively resisting again." Corporal Dalbec deployed the taser a second time. Defendant was removed from the vehicle and placed in handcuffs. Officers offered medical services but Defendant refused.[4]

---

[4] During Officer Burgett's testimony, the State showed some portion of a videotape from Officer Palmer's cruiser to the jury. The videotape does not appear to have been entered into evidence. The video purportedly showed a portion of the incident between Defendant and the officers. Another video recorded the conversation between Officer Bartolotta and Defendant while Defendant was sitting in Officer Bartolotta's cruiser at the scene. A third video recording depicted the conversation Officer Burgett had with Defendant on the way to the Sheriff's Department for booking. Finally, a fourth

Officer Bartolotta ultimately spoke to Katrina Groves, the passenger in the backseat of the vehicle, who claimed that she was arguing with her "man" on the phone and that she was not assaulted by Defendant.

Amber Williams, Defendant's ex-girlfriend, was riding in the passenger seat on the night of the incident. Defendant drove Ms. Williams and her friend, Ms. Groves, to Food Lion so that Ms. Groves could buy a pack of cigarettes and use the Coinstar machine to exchange coins for cash so that Ms. Groves could "put money on [her boyfriend's] books." Ms. Groves's boyfriend was incarcerated at the Sumner County Jail. Ms. Williams recalled that Ms. Groves was upset and crying "really bad[ly]" because she had told her boyfriend that she slept with someone else. When Ms. Groves exited the store, she was upset and stopped to smoke a cigarette outside the vehicle. Defendant remained outside the vehicle, talked to her, and asked her if she was alright. After she smoked a cigarette, everyone got back into the vehicle and left Food Lion. Defendant drove the vehicle to Mapco. Ms. Williams, seated in the passenger seat, turned around to console Ms. Groves who was seated in the back seat on the passenger side. The next thing the women knew, there were police officers outside the vehicle. The officers asked Ms. Williams if she was okay. She replied affirmatively. The officers asked Defendant and Ms. Groves to step out of the vehicle. Ms. Groves exited the vehicle. Defendant twice refused. Ms. Williams testified that Defendant "was not a person to curse" and did not curse at the officers. Ms. Williams saw an officer reach inside the car to grab Defendant; he flinched. Then, she saw an officer open the door and grab Defendant; he pulled away and the officers used a taser to subdue Defendant. Neither Ms. Williams nor Ms. Groves saw Defendant actively kick or hit an officer. Ms. Groves stated that Defendant "may have accidentally kicked someone . . . while he was being tased."

Defendant testified that when they arrived at the Food Lion, he got out of the vehicle to use the bathroom. Ms. Groves was crying. When Ms. Groves finished inside the store, she wanted to smoke a cigarette. Defendant was "pretty much allergic to cigarettes" so he told Ms. Groves to smoke outside the car. Additionally, Defendant was driving a rental car because his own car was totaled a month and a half prior to the incident. Defendant stood outside the vehicle with Ms. Groves while she smoked and told her that everything would be fine. Once she finished smoking, they got into the vehicle and drove to the Mapco. Defendant stopped the vehicle and looked at his phone to "check Facebook." When he looked up, he "noticed a bunch of cop cars were coming towards the parking lot." An officer approached the vehicle and told Defendant he was

---

videotape depicted Defendant at the Portland Police Department. None of the videos appear in the record on appeal and none appear to have been entered as exhibits at trial.

investigating a "domestic call." The officer asked Defendant to exit the vehicle. Defendant refused.

Defendant explained that he had been arrested once before in Kentucky. On that occasion, Defendant was the passenger in a car that got pulled over after leaving a bar. During the stop, Defendant got out of the vehicle and was arrested for public intoxication "for getting out of the car."

Defendant denied cursing at the officers. He explained that an officer "reached in [through the car window] and tried to pull [him] out of the car so [he] pulled back." The second time, the officer "opened the door and . . . grabbed [him] by the arm again and tried to pull [him] out." Defendant heard an officer say "taser taser," and Defendant informed the officers that he had a hernia. Defendant stated that if he kicked any of the officers it was involuntary and that he did not assault the officers. Defendant testified that he was "scared" of being injured and was "nervous" that he was going to get arrested.

At the conclusion of the trial, the jury found Defendant guilty of one count of assault with respect to Corporal Dalbec and guilty of resisting a stop. The jury found Defendant not guilty of the remaining three counts of assault, all pertaining to Defendant's actions against the other officers. The trial court sentenced Defendant to judicial diversion. With respect to the assault of Corporal Dalbec, Defendant was sentenced to eleven months and twenty-nine days of supervised probation at 75% service.[5] With respect to the resisting a stop conviction, Defendant was sentenced to six months of supervised probation at 75% service with a "[b]eginning date of 5/8/15 and an [e]nding date of 11/8/15."

Defendant filed a timely motion for new trial in which he argued that the trial court improperly denied the motion to suppress and that the evidence was insufficient to support the verdicts. The trial court denied the motion. Defendant filed a timely notice of appeal.

*Analysis*

*I. Motion to Suppress*

On appeal, Defendant first challenges the trial court's denial of the motion to suppress. Specifically, Defendant argues that his seizure was illegal "because the [p]olice

---

[5] The judgment reflects that the probationary period had a "[b]eginning date" of "5/8/15" and an "[e]nding date" of "5/7/15." On remand, the judgment should be corrected to reflect an ending date of 5/7/16.

had no probable cause to attempt to arrest [Defendant]." Moreover, Defendant insists that this was not the type of situation contemplated by *Terry v. Ohio*, 392 U.S. 1, 21 (1968), because it was "a custodial arrest in which [Defendant] was seized, ta[s]ed, handcuffed, and searched." The State disagrees, instead arguing that the "seizure" of Defendant occurred when Officer Burgett opened Defendant's car door and ordered Defendant to exit the vehicle and that the detention and resulting arrest were justified based on the report of a citizen informant of a domestic disturbance, a visibly upset female in the back seat of the vehicle, and Defendant's hostile refusal to exit the vehicle.

The motion to suppress filed by Defendant in this case sought to suppress "any evidence that flows from the illegal arrest" without identifying the nature or identity of the evidence. This Court has stated:

> A motion to suppress, like any other motion, is required to state the grounds upon which it is predicated with particularity. Tenn. R. Crim. P. 47. Thus, before an accused is entitled to an evidentiary hearing, the motion 'must be sufficiently definite, specific, detailed and non-conjectural, to enable the court to conclude a substantial claim . . . [is] presented." *State v. Davidson*, 606 S.W.2d 293, 297 (Tenn. Crim. App. 1980). *See State v. Howell*, 672 S.W.2d 442, 444 (Tenn. Crim. App. 1984).

*State v. Burton*, 751 S.W.2d 440, 445 (Tenn. Crim. App. 1988). When a motion does not comply with Rule 47, a defendant is "not entitled, as a matter of law, to an evidentiary hearing." *Id.* (citing *Howell*, 672 S.W.2d at 444). On the other hand,

> [w]hen the allegations contained in a motion to suppress entitled the accused to an evidentiary hearing, the accused has the initial burden of proving by a preponderance of the evidence (a) he has a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized, *State v. Roberge*, 642 S.W.2d 716, 718 (Tenn. 1982); *State v. White*, 635 S.W.2d 396, 399 (Tenn. Crim. App. 1982), (b) *the identity of the items he seeks to suppress as evidence*, *State v. Johnson*, 705 S.W.2d 681, 683 (Tenn. Crim. App. 1985), and (c) the items were seized without a warrant.

*Burton*, 751 S.W.2d at 445 (emphasis added). The motion to suppress herein contains a lengthy recitation of the facts leading up to Defendant's arrest and seeks to suppress "any evidence that flows from the illegal arrest." In our view, Defendant was not "entitled, as a matter of law, to an evidentiary hearing." *Id.* at 445; *see also State v. Jefferson*, 938 S.W.2d 1, 9 (Tenn. Crim. App. 1996) (upholding trial court's refusal to hold evidentiary hearing where motion to suppress was inadequate while recognizing "the time constraints and plight of appointed counsel" but refusing to "overlook or bend the rules to

8

accommodate these individuals"). Of course, a trial court may conduct an evidentiary hearing incident to a motion to suppress notwithstanding the deficiency in the pleadings. In this case, however, no actual evidence was obtained as a result of the allegedly illegal seizure that could be suppressed. Defendant suggests that an allegedly illegal seizure can somehow operate to vitiate a crime committed after the seizure. That is not the law. "Whether the arrest was or was not supported by probable cause is not determinative as to whether [the] defendant resisted arrest. A defendant may still be guilty of resisting arrest even if the arrest is unlawful." *State v. Edward Iroghuehi Isibor*, No. 01C01-9610-CC-00041, 1997 WL 602945, at *3 (Tenn. Crim. App. Sept. 30, 1997), *perm. app. denied* (Tenn. Aug. 3, 1998) (citing T.C.A. § 39-16-602(b)). Thus, suppression was not an available remedy in this case because no evidence was obtained as a result of the allegedly illegal seizure and, therefore, there was no evidence to be suppressed. Defendant is not entitled to relief on this issue.

## *II. Sufficiency of the Evidence*

Defendant also challenges the sufficiency of the evidence with regard to his convictions for assault and resisting a stop. He argues that there "was no testimony that he intentionally used any force" but merely pulled away from the officers and involuntarily came in contact with the officers as a result of his reaction to the taser. Moreover, Defendant insists that the State failed to prove assault because Corporal Dalbec never testified that he feared imminent bodily injury. The State disagrees.

While not raised by either party, we are compelled to point out a few things that happened during the trial in this matter and its effect on our review. First, as noted at the outset of the opinion, the transcripts provided to this Court on appeal were not prepared in the typical fashion by a court reporter but instead were transcribed by a member of defense counsel's staff from a recording made by defense counsel. Secondly, of particular importance to our discussion of the sufficiency of the evidence, there were no exhibits submitted with the record on appeal. In fact, the record does not reflect that any exhibits were entered during the trial. However, in the transcript, during the testimony of Officer Burgett, the jury viewed at least a portion of a videotape of the incident recorded by a police cruiser at the scene. Counsel for Defendant did not object to the jury viewing the videotape. It does not appear that counsel for the State or Defendant ever admitted the videotape into evidence as an exhibit. There are no videotapes in the record on appeal.

While the testimony in the record certainly supports the jury's verdict, as pointed out above, the record does not contain what the jury saw in one of the videos. The defendant has a duty to prepare a record that conveys "a fair, accurate and complete account of what transpired with respect to the issues which form the basis of the appeal" and will enable the appellate court to decide the issues. Tenn. R. App. P. 24(b).

It is well-established that an appellate court is precluded from considering an issue when the record does not contain a transcript or statement of what transpired in the trial court with respect to that issue. Moreover, the appellate court must conclusively presume that the ruling of the trial judge was correct, the evidence was sufficient to support the defendant's conviction, or the defendant received a fair and impartial trial. In summary, a defendant is effectively denied appellate review of an issue when the record transmitted to the appellate court does not contain a transcription of the relevant proceedings in the trial court.

*State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990). Accordingly, Defendant's failure to include a complete record of the proceedings forming the basis of this appeal results in waiver to any challenge of the lower court's rulings. *See generally State v. Ballard*, 855 S.W.2d 557, 560-61 (Tenn. 1993) (determining appellant's failure to provide court with complete record relevant to issues presented constitutes waiver of issue); *State v. Draper*, 800 S.W.2d 489, 493 (Tenn. Crim. App. 1990) (holding appellate court is precluded from considering issue when record does not contain transcript of what transpired in trial court with respect to that issue). In the absence of a complete record, we must presume the findings of the trial court are correct. *See State v. Boling*, 840 S.W.2d 944, 951 (Tenn. Crim. App. 1992); *State v. Bibbs*, 806 S.W.2d 786, 790 (Tenn. Crim. App. 1991) (citing *Smith v. State*, 584 S.W.2d 811, 812 (Tenn. Crim. App. 1979); *Vermilye v. State*, 584 S.W.2d 226, 230 (Tenn. Crim. App. 1979)). This Court is precluded from reviewing the sufficiency of the evidence. Defendant is not entitled to relief on this issue.

## Conclusion

For the foregoing reasons, the judgments of the Criminal Court are affirmed. However, the case is remanded for the correction of a clerical error.

_____
TIMOTHY L. EASTER, JUDGE

10